JULIA M. WALSH and EDWARD J. WALSH, Appellants, v. JULIUS S. WALSH, MISSISSIPPI VALLEY TRUST COMPANY, WALSH FIRE CLAY PRODUCTS COMPANY, EDWARD W. HUMPHREYS, MISSISSIPPI GLASS COMPANY and FREDERICK VIERLING.

Division One, December 2, 1920.

1. **ADMINISTRATOR: Acquirement of Estate Property: Confidential Relation to Heirs.** A trust company, which acts as administrator of an estate, and the president of said company, occupy a confidential relation to the heirs, and neither can acquire from them by gift or purchase any property belonging to decedent's estate, except upon the most perfect understanding by the heirs of their rights and by their entirely free and voluntary act.

2. ————: ————: **Oral Agreement: Burden of Proof: Acquiescence.** The burden of proof rests upon the claimant of personal property alleged to have been acquired by oral agreement with decedent in his lifetime, to satisfy the conscience of the court beyond a reasonable doubt of the existence of said oral contract, and that decedent's heirs with full knowledge acquiesced in the carrying out of the same after decedent's death, and judgment must be rendered for the heirs, unless, under the circumstances of the case, their assertion to its ownership is inequitable, or is barred by laches or limitations.

3. ————: ————: **Fraud: Burden of Proof.** The burden of proving a charge that a surviving stockholder in a company of which decedent was the other, entered into a fraudulent conspiracy with the trust company which administered on the estate and with its president, whereby said president acquired nominal ownership of one-third of the stock without paying for the same, rests upon the heirs who charge it, and the burden is not cast upon said stockholder to disprove the fraud by the joining of said administrator and president as defendants and co-conspirators.

4. ————: ————: ————: **Proof.** Fraud is never presumed, and while it may be proved by circumstantial evidence, if the transaction relied upon to prove it is as consistent with honesty and good faith as with a fraudulent purpose, it will be referred to the better motive.

5., APPELLATE PRACTICE: Appeal in Equity Suit: Deference to Chancellor.  While the appellate court will try an equity suit de novo and pass upon the evidence as well as the law, it will, where the evidence is oral and conflicting on crucial points, defer somewhat to the judgment of the lower court and follow its findings of fact, unless, after giving such findings due consideration, the weight of the evidence is contrary thereto.

6. ORAL AGREEMENT: Testimony of Other Party.  Finding no reason from an examination of the evidence to doubt the testimony of one stockholder of a company, it is held that his testimony established beyond a reasonable doubt that he and the other stockholder entered into an oral agreement, during the lifetime of said other stockholder, to divide the stock of the company into three equal parts and transfer one-third of it to defendant, a brother of said decedent, for a valuable consideration, and that the whole of said agreement was consummated during decedent's life, except the issuance and delivery of said stock.

7. LOOSE BUSINESS METHODS: Dealings Between Relatives: Oral Agreement.  Loose methods of doing business amongst close relatives and friends are not infrequently evidence of absolute confidence in one another, and not of fraud.  The fact that the agreement between defendant and his brother and nephews, who were owners of all the stock of a corporation, to divide it into three equal parts and transfer one-part to defendant in payment for large sums of money advanced by him through a series of years, for which he took no notes, was not in writing, and was allowed to remain unexecuted during the lifetime of the brother except by a verbal understanding that it was considered executed, does not tend to establish fraud on defendant's part, where the evidence shows that all the parties had the utmost confidence in each other and considered their word as good as their bond.

8. CHARACTER OF LITIGANT.  The general business standing of defendant and his intimate and affectionate relations with his deceased brother and with his widow and only son, whom he is charged with having defrauded, may be considered and weighed in his favor in determining whether the charge is true.

9. ACCOUNTING: Broad Equitable Principles.  A suit in equity for an accounting of the profits made or alleged to have been made out of shares of stock belonging to decedent and alleged to have been converted by defendant, is to be ruled on broad equitable grounds, and all the facts and circumstances in the case, as bearing on the equities of it, are taken into view, in order to arrive at a just result.

Walsh v. Walsh.

10. ———: **Transfer of Stock: Possession.** Where decedent sent certificates of stock, indorsed by him, to the secretary of the company, with written instructions to hold them subject to the order of defendant, possession in law was thereby given to defendant, although he never called for them during the lifetime of decedent; for the secretary held possession for defendant as his agent.

11. ———: ———: **Enforcing Option.** Where certificates of stock were delivered to defendant by decedent, in his lifetime, as collateral security with the option to purchase, his death did not terminate the option, but defendant thereafter had a right to enforce it.

12. ———: **Parol Agreement: Binding in Morals.** If the parol agreement is binding in good morals, though it may not be enforceable as a strict matter of procedure at law or in equity because of the maker's death, his heirs will not be given relief against it, if they have suffered no injury by defendant's compliance with it and have no cause of grievance on account of it.

13. ———: ———: **Repudiating in Part: Doing Equity.** The heirs cannot hold defendant to the execution of an oral agreement with decedent in so far as it was beneficial to them, and repudiate it in all other respects. He who comes into equity must not only show that he was damaged and injured by the acts complained of, but he must also do equity.

14. ———: **Laches.** Where the heirs with full knowledge for fifteen years acquiesced in the carrying out of the oral contract between their intestate and defendant and reaped great profits thereby, and the memory of the living witnesses have begun to fade and other persons whose intimate knowledge of the transactions would have made them the most important witnesses are dead, and there really appears to be no equity in their suit for an accounting, it will be held that the heirs are estopped by their laches from maintaining it.

Appeal from St. Louis City Circuit Court.—*Hon. Vital W. Garesche*, Judge.

AFFIRMED.

*Lehmann & Lehmann* and *Frank Y. Gladney* for appellants.

(1) Plaintiffs have pursued the proper remedy. (a) The probate court has no general chancery juris-

diction. State ex rel. v. Bird, 253 Mo. 580; Kelley's Probate Guide (4 Ed.), p. 110, sec. 115. (b) This suit is to be distinguished from one against an administrator (and perhaps his sureties) to recover assets reported in his final settlement, but not turned over to the distributees. State ex rel. v. Welsh, 175 Mo. App. 303. (c) The circuit court is a court of general original chancery powers. State ex rel. v. Dearing, 180 Mo. 64; Arnett v. Williams, 226 Mo. 118-9. (d) It is only a court having original chancery powers that can exercise jurisdiction in such case as this. Butler v. Lawson, 72 Mo. 245; Scudder v. Ames, 89 Mo. 521; Estate of Glover, 127 Mo. 163-4; Payne v. Hook, 7 Wall. (U. S.) 425; Prince v. Towns, 33 Fed. 163. (2) The right, title and interest of the deceased in the fifty-four shares of so-called treasury stock are not affected by the fact that the shares stood in the name of another. Tufts v. Volkening, 122 Mo. 631. (3) The trust company as administrator acquired title to and held all property of the deceased as the trustee of an express trust created by statute, for the benefit of the creditors and distributees. Naylor v. Moffatt, 29 Mo. 128; Scudder v. Ames, 89 Mo. 513; Clyce v. Anderson, 49 Mo. 41; Decouche v. Savetier, 3 Johns Ch. 90. (4) The blind entry on the books of the trust company administrator under date of July 27, 1901, charging itself with only 333 shares of stock, and thereby disowning the remaining 113 shares as the property of the estate, was a fraudulent act of waste and mismanagement sufficient to disqualify it under the statute. R. S. 1899, sec. 42. (5) Failure to include the shares in dispute in the inventory was a fraudulent act and a violation of the statute. R. S. 1899, sec. 64. (6) Under the statute it was the duty of the trust company administrator to file with the inventory a statement of the contract of pledge and option to purchase, signed by deceased and then held by its chief executive officer, Julius S. Walsh, and it violated the statute by failing to do so. R. S. 1899, sec. 70. (7) Under the

statute the trust company could only indorse and de-
liver the certificates of stock pursuant to an order of the
probate court and then only (a) to a creditor in dis-
charge of an amount of his claim equal to the amount of
such stock, or (b) to the distributees. R. S. 1899, sec.
210; Cape Girardeau Co. v. Harbison, 58 Mo. 94;
Chandler v. Stevenson, 68 Mo. 453; Weil v. Jones, 70
Mo. 561; State to use v. Berning, 74 Mo. 96; Mosman
v. Bender, 80 Mo. 584; State ex rel. v. Dickson, 213
Mo. 91. (8) The trust company, as administrator, and
Julius Walsh and Humphreys, because of their posi-
tions of confidence and trust in ascendancy over the
plaintiffs, have the burden of proving that the transfer
of the stock was honest and fair and that no unfair ad-
vantage was taken of plaintiffs, one of whom was a
minor. Newman v. Newman, 152 Mo. 413; Cornet v.
Cornet, 248 Mo. 234. (9) The blank indorsement of cer-
tificate No. 9, for 150 shares made by Edward Walsh, Jr.,
in 1897, was made for the exclusive purpose of hypo-
thecating the certificate as collateral to the note held by
Julius Walsh, and in recognition of the option to pur-
chase by the latter. The right of the pledgee under the
pledge and of the optionee under the contract of option
to purchase, were never exercised or availed of by Julius
Walsh during the lifetime of the deceased. And the
answers disclaim that such rights were exercised or as-
serted after the death of Edward Walsh, Jr. There-
fore, the power of attorney conferred by the indorse-
ment of the certificate by Edward Walsh, Jr., was never
exercised and for any other purpose whatever the in-
dorsement and delivery was revoked by his death. Clark
v. Boyd, 2 Ohio Rep. 281. Burchett v. Fink, 139 Mo.
App. 385; Bromage v. Lloyd, 1 Eck. 32, 154 Eng. Re-
print, 14; Kern's Estate, 176 Pa. St. 373. And by the
transfer of the certificate to himself on the supposed au-
thority of the revoked indorsement Julius Walsh ac-
quired no title whatever. (10) The transfer of the stock
in February, 1902, by defendant Julius Walsh to him-

self bears all the earmarks of fraud. (a) It was fraudulent *per se* in that he was transferor and transferee, and at the time in a position of the highest trust and confidence. Michoud v. Girod, 4 How. (U. S.) 553. (b) It was preceded and followed by much concealment. Cass County v. Green, 66 Mo. 504. (c) Extraordinary methods were resorted to in (a) keeping the whole matter from the probate court; (b) making not a scrap of writing to show the consent and knowledge of plaintiffs; (c) adopting the form of a revoking indorsement as a means of making the transfer legal in form. Baldwin v. Whitcomb, 71 Mo. 659. (d) Accepting his own statements as true, yet he acted as judge in his own cause, and thereby in his private capacity assumed and exercised to his own gain "the gravest responsibility" of a court of equity. Kinney v. Murray, 170 Mo. 701. To act as a judge in one's own cause is a flagrant violation of the policy of the law and of the sentiment of mankind, Oakley v. Aspinwall, 3 N. Y. 549; Dimes v. Canal Co., 3 H. L. 793. (e) It is when the circumstances are all viewed together, each in relation to all the others, that the fraud most clearly appears. Bank v. Hutton, 224 Mo. 71; St. Francis Mill Co. v. Sugg, 206 Mo. 155. (f) "The very plot is an act in itself." Mulcahy v. Queen, L. R. 3, H. L. 317. "The unity of the plan embraces all the parts." Swift & Co. v. United States, 196 U. S. 396. (11) Plaintiffs are entitled to recover the 2833 shares of stock or the value thereof which is presumptively par. Trust Co. v. Lumber Co., 118 Mo. 447; Momtt v. Hereford, 132 Mo. 513. They are entitled also to recover the sum received as dividends on such shares by defendant Julius S. Walsh. (12) The general denial becomes "mere burnt powder" (Ashton v. Penefield, 233 Mo. 417) in the same answer with the affirmative defense of the oral contract. State ex rel. v. Delmar Jockey Club, 200 Mo. 65. (13) Acquiescence like estoppel cannot be set up unless the person against whom it is asserted had full knowledge not only of the facts, but of his legal rights

under the facts. This is peculiarily true in a transaction between trustee and beneficiary. For, the former, when dealing with the latter, is under a positive duty to impart information and advice. Garesche v. Inv. Co., 146 Mo. 436; McPike v. McPike, 181 S. W.; Newton v. Rebenack, 90 Mo. App. 674; Saint Louis Bank v. Kennett, 101 Mo. App. 397; White v. Sherman, 168 Ill. 605; Williams v. Scott, Appeal Cases 1908, H. L., 508; 1 Bigelow on Fraud, pp. 315, 6; 2 Perry on Trusts and Trustees (6 Ed.), pp. 1394, 5. (14) There is not a single element of estoppel in the conduct of the plaintiffs. Blodgett v. Perry, 97 Mo. 272; Bramwell v. Adams, 146 Mo. 83; Kenney v. McVoy, 206 Mo. 58; Fruland v. Williamson, 220 Mo. 231; Troll v. Spencer, 238 Mo. 99. (15) The Statute of Limitations as such never runs between the beneficiary and the trustee of an express trust. The possession and title of the trustee is subordinate to that of the beneficiary, and this continues until the trust is terminated by complete performance or openly repudiated by the trustee. Rubey v. Barnett, 12 Mo. 8; Dillon's Admr. v. Bates, 39 Mo. 301; Elliott v. Machine Co., 236 Mo. 567; Witte v. Storm, 236 Mo. 491; Bent v. Priest, 86 Mo. 488; Case v. Goodman, 250 Mo. 114; Canada v. Daniels, 175 Mo. App. 55. Since Julius Walsh is a trustee *ex maleficio* the statute does not run as to him. (16) If we accept the answers as tendering a plea of laches in the name of the Statute of Limitations and acquiescence, yet there is no room in the case for the defense of laches. "Laches presupposes not only delay in the institution of proceedings for relief, but such knowledge of the facts on which the claim for relief is bottomed as renders that delay culpable." Butler v. Lawson, 72 Mo. 249. As between the beneficiary and the trustee of an express (as distinguished from an implied or constructive) trust lapse of time cannot begin to run as a bar unless and until the trustee openly disavows the trust and unequivocally makes this fact known to the beneficiary. Smith v. Richards, 52 Mo. 582; Goodwin v.

Goodwin, 69 Mo. 621.; Ivy v. Yancy, 129 Mo. 507; Andrews v. Smith Co., 191 Mass. 469; Oliver v. Piatt, 3 How. (U. S.) 411; Beecher v. Hohl, 199 Mo. 330; Meriwether v. Overly, 228 Mo. 242; Shelton v. Horrell, 232 Mo. 375; Kellogg v. Moore, 196 S. W. 16; Staunton v. Thompson, 234 Mo. 15. Here there is not only no repudiation of the trust, but instead, the trust company, as trustee, and Julius S. Walsh, trustee *ex maleficio*, deny that any trust ever existed. Without an antecedent acceptance and acknowledgment of the trust, a repudiation thereof is as inconceivable as treason without the duty of allegiance. It would be "intolerable" to sustain the plea of laches in such circumstances. Chouteau v. Allen, 70 Mo. 343. Moreover, the fraud here, if it is established, is concealed under the guise of an innocent purchase for value, and it would be a perversion of judicial procedure to penalize the plaintiffs for a delay brought about by the fraudulent concealment of the defendants. Prevost v. Gratz, 6 Wheat. 497; Bailey v. Glover, 31 Wall. (88 U. S.) 342; McCarthy v. McCarthy, 74 Ala. 546; Mullen v. Walton, 142 Ala. 173; Thomas v. Hurst, 73 Fed. 375; Russell v. Nat. Bank, 162 Fed. 868. (17) Because of the character and effect of the contract, the defendants must establish and prove its terms and performance beyond a reasonable doubt. It is an alleged ante-mortem oral contract set up to justify a post mortem distribution of property, in derogation of the Statutes of Frauds and of descents and distribution. Such contracts can only be enforced in equity, and to be so enforced must be proved beyond a reasonable doubt. Kinney v. Murray, 170 Mo. 674; Russell v. Sharp, 192 Mo. 270; Liberty v. Haines, 103 Me. 192. (18) As pleaded and attempted to be proved the alleged contract is judicially incredible. (a) As pleaded, defendant Julius Walsh avers that he surrendered the signatures of two note makers known to him to be good in order to obtain stock, which, if the allegations of the answer be true, he knew was wholly worthless. (b) As attempted to be proved by Humphreys,

in connection with the indisputable facts as to the profits and earning powers of the corporation Humphreys, in order to be relieved of a contingent and secondary liability as one of two accommodation signers of the corporation's paper to the extent of $46,000, surrendered a one-sixth interest in the corporation, although in the same year (1898) the corporation earned in net profits $54,000, and although he drew in cash during the same year from the antecedently accumulated profits the sum of $51,000. (c) In order for the contract to be accepted as true the court must believe that Edward Walsh, Jr., in order to be relieved of the same contingent and secondary liability, surrendered a one-sixth interest in the corporation, although in that year it earned $54,000, which was more than the entire indebetedness owing to Julius Walsh, and although there then stood on the books of the company to his (Edward's) credit, accumulated profits, earned and undrawn (but subsequently paid in full) the sum of $150,000, or more than three times the total indebtedness due Julius Walsh. (d) In 1897 the best terms that Edward Walsh, Jr., and Humphreys would make to Julius Walsh as to the stock was to give him an option to purchase the same at a price above par. In that year the company earned $8,500 in profits. In order for the court to accept and believe the alleged oral contract the court must find that in the fall of 1898 the contract of option was superseded by a verbal agreement by which Julius Walsh obtained 333 (not 300) shares without the payment of one penny therefor, although the profits of the company for 1898 were $54,000 as contrasted with $8,500 for the year 1897, when the option was taken by Julius Walsh. From any and all of these viewpoints the alleged contract as a business transaction is incredible. The court will not and cannot believe that sensible business men gave something of great value in exchange for what was of no value. Alleged business transactions of far less improbability have been rejected by the courts as incredible. Fry v. Piersol, 166

Mo. 434; Gloeckner v. Kittlans, 192 Mo. 489; St. Francis Mill Co. v. Sugg, 206 Mo. 167; Saggers v. Van Dyck, 37 N. J. Eq. 132; Chandler v. Town of Attica, 22 Fed. 626; Highland v. Railroad, 209 Pa. St. 297; Whelen v. Osgoodby, 62 N. J. Eq. 576. (19) The only proof offered as to the alleged oral contract consists of testimony by Humphreys, a party defendant, as to alleged oral admissions of the deceased. In probative force and effect this is the weakest of all evidence. It is incapable of refutation by direct proof; the temptation to misstate the facts is strong; and if there is any secret in the cause not understood, the aid of the court asked for on the strength of such testimony will be denied. Ringo v. Richardson, 53 Mo. 394; Johnson v. Quarles, 46 Mo. 427; Rosenwald v. Middlebrook, 188 Mo. 94. (20) The established facts do away with the import of Humphrey's testimony. Mabury v. McClurg, 74 Mo. 591; Burda v. Jones, 110 Wis. 60; Anderson v. Liljengron, 50 Minn. 4; Quock Ting v. United States, 140 U. S. 417.

*Boyle & Priest* and *Jourdan, Rassieur & Pierce* for respondents.

(1) The judgment of the lower court dismissing the bill of the appellants, based on the testimony of witnesses seen, heard and believed, should be accepted on appeal as conclusive, and as this is an equity case deference should be given to the findings of the trial judge who had better opportunity for testing and weighing the conflicting and irreconcilable evidence than this court. Springer v. Kleinsorge, 83 Mo. 152; Creamer v. Bibert, 214 Mo. 479; Hunnell v. Zinn, 184 S. W. 1157; Price v. Rausche, 186 S. W. 970; Vesser v. Neff, 214 S. W. 188; McKinney v. Hawkins, 215 S. W. 253; Bryant v. Stahl, 217 S. W. 32. (2) The appellants, with full and actual knowledge of the manner in which Julius S. Walsh had acquired his stock in the Mississippi Glass Company, could not wait for more than

fourteen years before commencing this action, without being barred by laches and the Statute of Limitations. The doctrine that equity follows the law is recognized by the courts of this State in applying the Statute of Limitations. Williamson v. Beaseley, 137 Fed. 470; Wetzell v. Minn. Ry. Transfer Co., 65 Fed. 26; Butler v. Lawson, 72 Mo. 249; Burrus v. Cook, 215 Mo. 506; Rutter v. Carothers, 223 Mo. 640; Shelton v. Horrell, 232 Mo. 356; Kellogg v. Moore, 271 Mo. 194; Haff v. Haff, 54 Mich. 511; Hammond v. Hopkins, 143 U. S. 250; Mackall v. Casilear, 137 U. S. 566; Jones v. Perkins, 76 Fed. 82; Burdett v. May, 100 Mo. 18; Brown v. County of Buena Vista, 95 U. S. 157; Abraham v. Ordway, 158 U. S. 416. (3) The appellants failed to prove that Edward Walsh, Jr., at the time of his death, was owner of more than 333 shares of stock of the Mississippi Glass Company. Secs. 2984, 2985, R. S. 1909; 1 Jones' Commentaries on Evidence, sec. 74 and Vol. 3, sec. 516-A; St. Louis Co. v. Goolfellow, 9 Mo. 149. (4) The manner in which this litigation was begun and prosecuted proves that the appellants are not in good faith, and have not come into a court of equity wih clean hands. 1 Pom. Eq. Jur., sec. 398.

SMALL, C.—Appeal from the Circuit Court of the City of St. Louis. This is a suit in equity, filed February 7, 1917, by Julia M. Walsh, widow, and Edward J. Walsh, son, of Edward Walsh, Jr., and his sole heirs, against the above defendants, to recover a certain fund as upon an accounting from Julius S. Walsh, the Mississippi Valley Trust Company and Edward W. Humphreys, arising from the exchange by said Julius S. Walsh of 113 shares of the capital stock of the Mississippi Glass Company, a corporation of Missouri, having a capital stock of $100,000, divided into 1000 shares of the par value of $100 each, for 2833⅓ shares, of the par value of $100 each, in a New York company of the same name, having a capital of $3,000,000.

The charge in the petition is, that of this capital stock, Edward Walsh, Jr., at the time of his death, owned 446 shares and E. W. Humphreys 554 shares, including their share of 54 shares, which stood in the name of other parties and which plaintiffs call treasury stock. That said 113 shares of stock belonged to Edward Walsh, Jr., at the time of his death, which occurred the 30th day of June, 1901. That by fraud and conspiracy between defendants, the Mississippi Valley Trust Company, which was the administrator of the estate of said Edward Walsh, Jr., Julius S. Walsh, who was president of said trust company, and defendant Edward W. Humphreys, said 113 shares of stock were never inventoried nor accounted for by said trust company, as such administrator, but were wrongfully converted to the use of said Julius S. Walsh on or about the 8th day of February, 1902, and were in the year 1904 transferred to said New York company by said Julius S. Walsh in exchange for said 2833⅓ shares of the capital stock in said New York company, who, since then, has received dividends on said New York stock amounting to $183,438. That all such stock in said New York company, and dividends so received, belong of right to the plaintiffs, but said Julius S. Walsh refuses to account for or pay same to the plaintiffs, but fraudulently persists in converting the same to his own use.

The prayer of the petition is, that the defendants Julius S. Walsh and Edward W. Humphreys and the Mississippi Valley Trust Company be required to make full resititution, and said Vierling, in whose name said stock stands in trust for said Julius S. Walsh and the New York company, be directed to transfer said 2833⅓ shares to plantiffs, and if this cannot be done, that plaintiffs have judgment against said Julius S. Walsh, Edward W. Humphreys and the Mississippi Valley Trust Company for the value of the shares of the New York company, which is not less than par, and for all dividends received by said defendants or either of them, together with interest and costs, and for general relief.

The separate answers of defendants Julius S. Walsh, Edward W. Humphreys and said trust company denied the allegations of conversion, fraud and conspiracy, and set up that defendant Julius S. Walsh acquired said stock by virture of an oral agreement made between said Edward Walsh, Jr., Edward W. Humphreys and Julius S. Walsh in 1898, by which each of them became the owner of 333⅓ shares, or one-third, of the capital stock of the Missouri company, which was all the shares owned by said Edward Walsh, Jr., at the time of his death, and which were duly inventoried and accounted for by defendant trust company as administrator. Also, in effect, set up the substantive facts shown in evidence by defendants, and pleaded that plaintiffs were estopped by their laches and lapse of time and defendant administrator's final settlement, as well as barred by the five and ten-year Statutes of Limitations.

The reply denied the new matter of the answers.

The other defendants filed a general denial.

The trial was commenced May 28, 1917, during the April term of said court, before Hon. Vital W.Garesche, Judge, and occupied more than two weeks of the time of the court.

The testimony is very voluminous. It would be wholly impossible to do more than set out a bare outline of its controlling features. The evidence shows that Julius S. Walsh and the deceased, Edward Walsh, Jr., were brothers, born and raised in St. Louis. Defendant Humphreys was their nephew, also born in St. Louis, but removed with his parents, when quite young, to New Jersey; but he and Edward Walsh, Jr., spent a large part of their school days together in the East. That the Mississippi Glass Company of Missouri was originally founded by George D. Humphreys, the brother of Solon Humphreys, who was the father of defendant Edward W. Humphreys. In 1876 said Solon Humphreys and John A. Walsh, a brother of Julius and Edward

Walsh, Jr., became the owners of said company, each owning one-half of the stock thereof. That John A. Walsh died about 1882, and under an order of the Probate Court of the City of St. Louis made in his estate, of which Julius S. Walsh was the administrator, and by agreement with Solon Humphreys, Edward Walsh, Jr., and Edward W. Humphreys, in April, 1883, acquired all of the stock in the company in consideration of their paying all of the debts of the company—for all of which, John A. Walsh and said Solon Humphreys were liable as endorsers. It was understood from the beginning, so defendant Edward W. Humphreys testified, that one-half of the capital stock belonged to Edward Walsh, Jr., and the other half to Edward W. Humphreys, although 523 shares stood in the name of Edward W. Humphreys on the certificate book of the company and only 423 shares in the name of Edward Walsh, Jr., up to the time of his death—the remaining shares standing in the names of third parties as collateral security, or to qualify them as directors. The undisputed evidence also shows the loaning of money every few months, from 1891 to 1897, by Julius S. Walsh to Edward Walsh, Jr., and Edward W. Humphreys, for the company, and the taking of their notes therefor for $31,216.50, dated January 1, 1897, and $16,020, dated April 1; 1897, respectively, with an agreement attached to the larger note stating that it was secured by 300 shares of the capital stock of said company, valued at $35,000 and which agreement also gave the said Julius S. Wash an option to purchase said 300 shares of stock "at any time during the continuance of this loan and 30 days after its payment, for the face value of this note and accrued interest, the said option to be exercised in written notification." The $16,020 note was for money which Julius S. Walsh borrowed from the defendant trust company to loan to his brother and Humphreys, and was secured by collateral which Mrs. Humphreys, the mother of Edward W. Humphreys, loaned to them

for the purpose. These notes were payable two years after the date. The defendant Edward W. Humphreys further testified that in the fall of 1898, Julius S. Walsh called the attention of both Edward Walsh, Jr., and said Humphreys to the fact that he had been informed by the book-keeper, Edwards, that certain large sums amounting to approximately $200,000 had some years before been placed to the credit of said Edward Walsh, Jr., and E. W. Humphreys, each, on the books of the company, which credits were not justified by the business and profits of the company, although no formal dividends had ever been declared by the company. That up to that time, said Humphreys had drawn cash from the company amounting to about $122,000, leaving him a credit of about $78,000, and said Edward Walsh, Jr., had drawn out about $57,000, leaving to his credit and owing him by the company, according to the books, the sum of $143,000. That Julius S. Walsh complained that such credits impaired the value of the 300 shares of stock, which he had the option to purchase. That both Humphreys and Edward Walsh, Jr., admitted the justice of the complaint made by Julius S. Walsh. That for several years before this note was made, Humphreys and Edward Walsh, Jr., considered the advisability of taking in the said Julius S. Walsh as a one-third owner of the business and had had prepared by Lodwick a written agreement, which was signed by Humphreys and which they intended to present and have Julius S. Walsh execute, dividing the stock of the company into three equal parts, of which said Julius S. Walsh was to take one, but the precise terms of which he could not recall. But the matter was neglected, and this written agreement was never presented to Julius S. Walsh. In 1897 Edward Walsh Jr., made a trip to Europe to investigate the manner of manufacturing wire glass in Germany, and to provide against the contingency of his death during the trip, he, himself, suggested the securing of his brother's debt, for which he had no note or written obligation of any kind up

to that time, by the making of said note for $31,216.50, to which said option was attached. After he returned, and in the fall of 1898, when Julius S. Walsh made the complaint, as to the credits on the books of the company in favor of said Humphreys and Edward Walsh, Jr., an oral agreement to give him one-third of the stock, if he would release them from their personal obligation to him and hold his debts against the company only, was entered into between said Edward Walsh, Jr., said Humphreys and said Julius S. Walsh, and that from that time forward, the stock in the company should be equally owned by the three of them, each of them owning 333⅓ shares, and Julius S. Walsh should look to the company only for his debts. But through mere neglect of the parties the books of the company and the stock certificates remained as they were before, and Julius S. Walsh continued to hold the two notes and option in his possession until the time of the death of Edward Walsh, Jr. Julius S. Walsh also testified, in substance, to the foregoing matters stated by said Humphreys, but on motion of appellants his testimony was stricken out, on the ground that Edward Walsh, Jr., the other party to the contract, was dead. Said Humphreys also testified further that on the night of the funeral of Edward Walsh, Jr., he called upon Julius S. Walsh, at his home in St. Louis, and they talked over the condition and affairs of the company the greater part of the night. That the company was then indebted to various banks in St. Louis in the sum of about $80,000, and to various banks and companies in the East about $70,000, on which Edward Walsh, Jr., and E. W. Humphreys were endorsers. (The company also owed other sums, and including credits to Humphreys and Edward Walsh, Jr., on its books, its total indebtedness was over $500,000.)

The company did not appear to have an established credit of its own at the banks. The value of the company consisted largely of its good will and real estate, practically up to the time of the death of Ed-

ward Walsh, Jr., according to the testimony of plaintiffs' witness, Baldwin. Mrs. Walsh said that her husband was much troubled, until a few months before his death, on account of financial conditions of the company, and the amount Humphreys had drawn from the company (although he had not exhausted his credit on the books). But that about three or four months before he died, her husband said that "matters were going along nicely, and he could now see daylight ahead of him." Humphreys also testified, in effect, that the company made no real money until about a year before Edward Walsh, Jr., died.

Defendants' expert accountant, Kribben, testified, that the book value of the stock on December 31, 1901, was a trifle less than par, and also that, according to the books, the company lost in the aggregate about $70,000 during the years 1893, '94, '95 and '96, but made a profit, in round numbers, of $8,000 in 1897, $54,000 in 1898, $34,000 in 1899, $54,000 in 1900, $98,000 in 1901, $122,000 in 1902, $164,000 in 1903, and $115,000 in 1904.

Plaintiffs' expert accountant, Wilson, agreed with Kribben, as to the profits shown for the years 1898 to 1904 inclusive, but he presented no figures as to the business for the years 1893 to 1898. These profits were figured from the book entries, as they existed on the books, and were not otherwise verified, and whether any, or sufficient, allowance was made for loss by depreciation in the value of the machinery, does not appear. Plaintiffs' witness, Baldwin, said that the machinery was antiquated and practically worthless at the time of the death of Edward Walsh, Jr., and that the company was not entitled to credit at the banks independent of the endorsement of Humphreys and Edward Walsh, Jr. Humphreys further testified that he told Julius S. Walsh in the conversation on the night of the funeral of Edward Walsh, Jr., that he feared the St. Louis banks would not extend credit on his endorsement alone, that they had theretofore relied mainly upon the endorsement of Edward Walsh, Jr., in extending credit to the company, and

that, in short, the interest of the company demanded that Julius S. Walsh should take the presidency of the company, become actively connected with it, and endorse for the company, as his brother had done in his lifetime. Julius S. Walsh suggested that Humphreys see the widow and her son, Edward J. Walsh, in regard thereto. Accordingly, Humphreys testified, that he called upon Mrs. Walsh, the next morning, at her home, and explained to her the condition of the company, that it was involved, that unless Julius S. Walsh became the president of the company and aided it with his credit, he did not think the company could go on. He told her there were many thousands of dollars of notes that had been endorsed by Edward Walsh, Jr., and himself, held by the banks in New York, two notes were held in Philadelphia, and several thousands of dollars in notes endorsed by Edward Walsh, Jr., and himself in the banks in St. Louis; that he could take care of the notes in New York with his personal endorsement, but that he feared that the notes in St. Louis could not be without the assistance of Julius S. Walsh. That it was necessary for him to become president to take her husband's place. That Mrs. Walsh became very anxious at that, and seemed very much concerned. She said that Julius ought to help his brother Edward at a time like that, and ought to become president of the company. That he was a third owner of the stock in the company, and for that reason it was his duty to help out. That he asked her if she knew how Julius S. Walsh had acquired that one-third interest, and she said, ''Yes,'' that Edward had told her about it. She knew all about it. She asked him to urge Julius to become president of the company. Humphreys informed Julius S. Walsh of his interview with Mrs. Walsh, and he agreed to become president of the company and help all he could. That the next morning after that, he returned to the home of Mrs. Walsh and told her that Julius S. Walsh had agreed to become the president of the company and do all in his power to help him put it on its feet. She seemed very much relieved and said

she was delighted that Julius would do this, that he owned one-third of the stock of the company, and that she knew that it would be carrying out "her dear Ed's wishes."

Plaintiffs introduced in evidence a letter dated October 10, 1901, written by Lodwick (who had for years been in charge of the office of the company in St. Louis) to E. W. Humphreys, stating that certain notes amounting to about $12,000 owing by the company to the Bremen Bank of St. Louis, Missouri, were coming due, and the bank had asked for the endorsement thereof by Julius S. Walsh in order to renew them. Also a letter dated October 18, 1901, written by Julius S. Walsh to E. W. Humphreys, stating that the Bremen Bank was demanding its money and saying "as stated to you, I could not go on any of these obligations until my holding with the company is settled and the relations between the eastern and western offices is fully known and put upon such a basis that the company could be managed as a whole with a foreknowledge of requirements. I spoke to you of these matters on my late visit to New York and I trust everything will be gone over for the coming month and settlements reached."

The defendant Mississippi Valley Trust Company was appointed administrator of the estate of Edward Walsh, Jr., deceased, on July 29, 1901, but no inventory was filed until the 16th day of June, 1902, after it had been several times cited by the probate court to file such inventory. The delay was occasioned, so the defendant Vierling testified, because the ownership of the stock of the company had not yet been settled, and that Julius S. Walsh did not wish to urge that he was the owner of any of these shares himself, but desired to wait until Humphreys arrived in St. Louis, which he soon was expected to do, when he could speak to Mrs. Walsh in regard to the matter. The certificates for all of the stock in the company, at the time of the death of Edward Walsh, Jr., were attached to the stubs in the stock certificate book of the company, where they had been placed at the time the option for 300 shares had been given to

Julius S. Walsh. There were two certificates for 150 shares each, one made out to Edward Walsh, Jr., and endorsed by him in blank, and the other made out to Ed-W. Humphreys and endorsed by him. Also a certificate to Edward Walsh, Jr., for 273 shares, and a like certificate to Edward W. Humphreys for 373 shares. The certificates for 150 shares were for the shares pledged to Julius S. Walsh and on which he had the option to purchase and which were held by Lodwick, subject to the order of Julius S. Walsh, according to the letters of Lodwick dated July 28th and August 4, 1897, to Edward Walsh, Jr., and Humphreys, respectively, and letter of Edward Walsh, Jr., to Julius S. Walsh, dated August 2, 1897. On February 6, 1902, there was a meeting at the office of the defendant trust company, at which the stock of the Missouri company was divided into three equal parts and certificates issued to Julius S. Walsh for 332 shares, to E. W. Humphreys 332 shares, to the estate of Edward Walsh, Jr., deceased, 332 shares, and 3 shares to qualify directors. The day before the meeting, Humphreys says, that he called upon Mrs. Walsh and explained to her the purpose of the meeting, which was to have the stock in the company properly divided, and attend to certain "wire glass" stock and dividends thereon. At this meeting, Julius S. Walsh, Edward W. Humphreys and Frederick Vierling testified, that they and the plaintiffs, Julia M. Walsh and Edward J. Walsh, and J. A. Lodwick, acting as secretary, were all present; that it was explained to Mrs. Walsh and her son that the "wire glass" stock and dividends thereon belonged to the company, and that Vierling told Mrs. Walsh and Edward J. Walsh that 423 shares of the stock stood on the books in the name of Edward Walsh, Jr., and he desired to know how many shares Edward Walsh, Jr., actually owned, and that both of the plaintiffs stated at that time, in answer to his inquiry, that he owned 333 shares, or one-third of 1000 shares; that he, Vierling, made a memorandum of the shares allotted to each shareholder at this meeting, delivered one copy to Lodwick,

so that he could write up the certificates according to the allotments, and one copy of the memorandum was taken by Humphreys, who, at the time, wrote on his copy, which was introduced in evidence, the following words: "February 6, 1902, stock of Mississippi Glass Company." The evidence shows that the certificates for the shares were filled out by Lodwick. Said Humphreys and Vierling and Julius S. Walsh, further testified, that Julius S. Walsh then asked Mrs. Walsh, after said division had been made, if she was satisfied with everthing, and she answered him that she was. He thereupon said: "Now, Julia, if you don't like this thing, it can be undone." She again expressed her satisfaction with things as they were.

The "wire glass" stock was stock in another glass company known as the Wire Glass Company and stood in the joint names of Edward W. Humphreys and Edward Walsh, Jr., and with the consent of the plaintiffs in writing, on February 7, 1902, it was transferred, together with a check for $5,088, dividends on said stock, payable to the estate of Edward Walsh, Jr., by the trust company, as administrator, to the Missouri company, on the affidavit of Humphreys that the stock belonged to the Missouri company. Humphreys and the Missouri company also agreed in writing to save the trust company harmless for making such transfer.

Subsequently, June 16, 1902, the inventory was filed in the probate court, and stated that Edward Walsh, Jr., owned 333 shares of stock of said Missouri company at the time of his death. The inventory, however, contained no statement of the $143,000 due from said company to the deceased. The payment thereof in bonds by the New York company, was, however, shown by the final settlement made on April 18, 1906. Two annual settlements, one made in 1902, and one in 1903, of which Vierling sent plaintiffs copies, showed the stock to be 333 shares. The plaintiffs admitted they received these copies.

On May 10, 1904, the 333 shares of stock in the Missouri company, issued to the estate of Edward Walsh,

Jr., in pursuance of the allotment made at the meeting on February 6, 1902, were delivered by the defendant administrator, to the plaintiffs, who receipted to the administrator on that date for the same. Plaintiffs endorsed the certificates back to the Mississippi Valley Trust Company as trustee, and in the fall of 1904, under a contract, which they and other stockholders agreed to, received 25 shares of stock in the Mississippi Glass Company of New York for each share of their stock in the Missouri company. Under the contract the New York company was also to pay all the debts of the Missouri company, then amounting to $371,000 or thereabouts, and plaintiffs were paid $143,000 in its bonds, on account of the debt to Edward Walsh, Jr., on the books of the Missouri company. These bonds bore six per cent interest per annum which plaintiffs had received up to the time of the trial.

The plaintiffs kept the stock in the New York company until 1917, and after they brought this suit, pending which, they sold said New York stock for $500,000. In the interval, from the time they received it, they both together had been paid approximately $500,000 dividends thereon.

The plaintiff Edward J. Walsh graduated from the University of St. Louis School of Law in 1904. He never practiced law, but in January, 1905, he was employed by the Missouri company at its plant in St. Louis, and he continued in the employ of the company until the year 1916, when he brought a suit in New York to restrain the New York company and its officers (of which he had also become a director) from increasing the capital stock of the company. This suit was dismissed, and thereupon said Edward J. Walsh was dismissed from his position as manager of the St. Louis plant, which he had occupied since 1912, as the successor of Robert A. Walsh, the son of Julius S. Walsh, whose displacement, after much complaint on his part, said plaintiff, Edward J. Walsh, had succeeded in procuring. After said plaintiff was dismissed as manager, he instituted a suit in the Circuit

Court of the City of St. Louis in the spring of 1916, in all respects similar to this suit and against the same parties, which the plaintiffs voluntarily dismissed February 7, 1917, and the same day filed the suit now before us.

The evidence shows that plaintiff Edward J. Walsh exercised a vigilant and zealous watch over the company and the interests of the plaintiffs therein, practically from the time he entered its employment in January, 1905, until he was discharged as manager. That as early as 1910 he consulted counsel in St. Louis as to some matter of complaint against the company. Subsequently in 1914 and 1915 he employed lawyers in New York and St. Louis. He was made secretary of the company in 1907, and manager of the St. Louis plant in 1912, and was thus in charge of the books and papers of the company for about ten years before this suit was instituted.

Robert A. Walsh and Julius S. Walsh, both testified that in 1904 or 1905, when plaintiff Edward J. Walsh first obtained employment with the company, Julius S. Walsh explained to said Edward J. Walsh that he had become the owner of his one-third of the stock by releasing his father and Humphreys from their personal obligations for the debts of the company. The witnesses Baldwin, Parker, Duane Humphreys and E. W. Humphreys testified to conversations had with the plaintiff Edward J. Walsh, from 1905 to 1915, in which said plaintiff at different times complained of the manner in which Julius S. Walsh had procured his stock and expressed dissatisfaction therewith stating to some of them that he had procured it without consideration.

Both of the plaintiffs testified that when Edward Walsh, Jr., died they understood that he owned one-half, or practically one-half, of the capital stock of the Missouri company, and that Humphreys owned the balance. That after his death they learned that Edward Walsh, Jr., only owned one-third of the stock at the time of his death, and the other two-thirds of the stock were owned by Julius S. Walsh and E. W. Humphreys, each owning one-third, respectively. Mrs. Walsh says that she learn-

ed this from Julius S. Walsh shortly after her husband's death. But plaintiff Edward J. Walsh stated that while he got his information that Julius S. Walsh owned one-third of the stock approximately at the time of his father's death, he did not know the source of his information. The plaintiffs testified that no one ever informed them just how Julius S. Walsh procured his stock, but they understood, in a general way, that it was taken for a loan made to the company, and they were never otherwise informed until in 1915, when they had an expert go over the books of the company, at which time they learned the fact that the debts, with compound interest, amounting to $45,000, which the company owed to Julius S. Walsh, were paid at the time the Missouri company was taken over by the New York company in the fall of 1904. The plaintiffs both testified that at the meeting of February 6, 1902, nothing was said or done about the stock of the Missouri company or its ownership or division by any one, and that the only business done referred to the "wire glass" stock, which they transferred to the Missouri company; that at no time nor place did either of them state that Edward Walsh, Jr., owned only one-third of the stock of the company in his lifetime, or that they knew that Julius S. Walsh owned one-third of the stock during the lifetime of Edward Walsh, Jr. Plaintiff Edward J. Walsh also denied the conversations testified to by the defendants and their witnesses, as to his expressing dissatisfaction with the manner in which his uncle procured his shares.

The lower court found a decree for the defendants and dismissed the plaintiffs' petition. The learned chancellor below also filed a written opinion, which appellants have printed in their abstract of the record, expressly stating that the court believed the testimony of defendant Humphreys as to the verbal agreement made in the fall of 1898, by which said Julius S. Walsh was to own one-third of the stock of the said company; and believed the testimony of the defendants and their witnesses, rather than the plaintiffs, that with full knowl-

edge of all the facts the plaintiffs acquiesced therein, and, besides, the plaintiffs were guilty of such laches as barred their rights to a recovery. Other details may be referred to in the course of the opinion.

Failing to procure a new trial, the plaintiffs brought the case here by appeal.

I. It is true that defendant trust company, being the administrator of the estate of Edward Walsh, Jr., deceased, was trustee for and occupied a highly confidential relation to the plaintiffs, and defendant Julius S. Walsh, being president of the trust company, also occupied such confidential relation, and neither could acquire by gift or purchase from the plaintiffs any property belonging to the estate of their deceased husband and father, except under the most perfect understanding of their rights and by their entirely free and voluntary act. But, in this case, neither of said defendants claimed to have purchased or to have received by gift, the stock in question from the plaintiffs, but claim the ownership thereof by Julius S. Walsh under an oral contract made with Edward Walsh, Jr., during his lifetime. But said Edward Walsh, Jr., being dead, we rule, that the burden of proof is upon said defendant, Julius S. Walsh, to satisfy the conscience of the court beyond reasonable doubt of the existence of said oral contract, and that plaintiffs with full knowledge acquiesced in the carrying out of the same after the death of said Edward Walsh, Jr., or, under the circumstances in evidence, their case is inequitable, or by lapse of time since the transaction complained of the plaintiffs are barred by their laches or the Statutes of Limitations.

*Confidential Relation.*

*Burden of Proof.*

II. But the burden of proving the fraud or conspiracy charged against the defendant Edward W. Humphreys is upon the plaintiffs. They must make out their case against him by clear and convincing evidence. The mere fact that he is made a defendant and charged with fraud and conspiracy jointly with the defendants, Julius S. Walsh and the Mississippi

*Fraud.*

Valley Trust Company, administrator, upon whom the burden of proof does rest, does not cast said burden upon said Humphreys to establish his innocence of the charges against him. Fraud is never presumed, and while it may be proved by circumstantial evidence, if the transaction relied upon to prove fraud is as consistent with honesty and good faith as with a fraudulent purpose, it will be referred to the better motive. [Jones v. Nichols, 216 S. W. 962; Garesché v. MacDonald, 103 Mo. 1; Hardwicke v. Hamilton, 121 Mo. 465; Warren v. Ritchie, 128 Mo. 311.]

III.    It is also true, that in equity cases this court will try the case *de novo* and pass upon the evidence as well as upon the law.   But in order to aid the court in its search for the truth as to the facts when the evidence is oral and conflicting on the crucial points, it is an established rule of the court to defer somewhat to the judgment of the lower court and to follow its finding as to the facts, unless, in our judgment, after giving the finding of the lower court just consideration, the weight of the evidence is contrary to such finding.

**Deference to Chancellor.**

In this case, the lower court found all of the issues of fact for the defendants in its decree of record, and in its opinion, which appellants have inserted in the record, the lower court expressly stated that it believed the testimony given by the defendants, Julius S. Walsh, E. W. Humphreys and Vierling, as well as the other witnesses for the defendants as to the manner in which said Julius S. Walsh acquired the stock in question, and the knowledge, consent and acquiescence of the plaintiffs therein, and that defendants' testimony was much more convincing and of greater weight than the testimony of the plaintiffs given as witnesses in their own behalf. The lower court heard and saw the witnesses, observed their demeanor and actions while testifying on the stand, and in that regard, had a much better opportunity to judge of the accuracy, weight and credibility of their testimony, than is afforded this court by the cold, dead

type of the record. Under the well established rule in such cases, we shall follow the finding of the lower court as to the facts in this case.

IV.   We hold that the plantiffs have wholly failed to make out their case against defendant Humphreys. Indeed, we cannot find even the least suspicion of fraud or conspiracy against him. In our judgment, the evidence shows he sought and did nothing other than that which was in the interest of the plaintiffs. He nowhere profited at their expense. We can find no sufficient motive in the evidence which could have induced Humphreys, at the time of the death of Edward Walsh, Jr., to voluntarily enter into a conspiracy to give one-third or more of his stock to Julius S. Walsh, on the terms of said parol agreement and thereby and thereafter assist Julius S. Walsh to make a fraudulent claim to a portion of his dead brother's stock.   Indeed, if Humphreys would have thus defrauded the widow and child of his dead partner, would he not also have made some attempt to claim the 100 shares more than his part, which had always stood in his name on the books of the company, and which the plaintiffs alleged he owned? But plaintiffs' learned counsel say that when Edward Walsh, Jr., died, the condition of the company was such, in effect, at least in the opinion of Humphreys, that it required some one of financial and business standing and influence to take the place of Edward Walsh, Jr., in the company, and Julius S. Walsh possessed these qualifications, and would make an efficient substitute for his brother.   They argue that, acting under the Greek maxim that ''sometimes a half is greater than the whole,'' Humphreys, after the death of Edward Walsh, Jr., entered into a verbal contract with Julius S. Walsh to make him one-third owner of the capital stock, set up in the answer, and then he and Julius S. Walsh fraudulently claimed that such contract had been made and agreed to by Edward Walsh, Jr., in his lifetime.

*Oral Agreement Proven.*

The evidence shows, that the stock was undoubtedly, and indeed it is claimed by the plaintiffs to have been, materially more valuable and the company in better condition at the time of the death of Edward Walsh, Jr., in 1901, than it was in the fall of 1898, when defendants claimed the contract to divide the stock into three equal parts was made. The Greek maxim, therefore, that "sometimes a half is greater than the whole," is as much, if not more, applicable to the situation shown in evidence in the fall of 1897, than it was in 1901, and is likely the true explanation of why said verbal contract was made in the fall of 1898 in the lifetime of Edward Walsh, Jr., as testified to by Humphreys.

As the record shows, Julius S. Walsh was and for many years had been connected with many large enterprises in the City of St. Louis, and was a man of high standing in business and financial circles. Humphreys says that, for several years prior to 1898, he and Edward Walsh, Jr., had desired to have Julius S. Walsh interested in the business, and as early as 1895 or 1896 they had drawn up a contract by which he was to have one-third of the stock. That Lodwick wrote the contract, and that he, Humphreys, signed it, and their intention was to have it presented to Julius S. Walsh, but the matter was delayed and postponed, and through mere neglect was never consummated.

It is not an unusual thing for the owners of such business as this to offer quite favorable inducements to some third party of strong business connections and financial standing—especially if he is a near relative in whom they have the greatest of confidence, as in this case—to become associated with them in such business in order to secure the benefit of his standing and influence. It is frequently a wise and profitable thing to do, as, in our judgment, the sequel shows was so in the case before us.

Finding no reason to doubt the truth of the testimony of Humphreys, we find, as was found by the lower court who heard him testify, that his testimony estab-

lished beyond reasonable doubt, that said oral contract divide the stock into three equal parts was made as alleged in the answer.

V. But plaintiffs' learned counsel urge that the appointment of Robert A. Walsh, the son of Julius S. Walsh, as secretary of the company, at the time Julius S. Walsh was made president, which was a few days after the death of Edward Walsh, Jr., to succeed Lodwick, was for a fraudulent purpose. They say that Lodwick was a friend of Edward Walsh, Jr., and knew the facts relating to the ownership of the stock, and would not have signed the certificates of stock as secretary, which were issued and delivered to Julius S. Walsh in February, 1902, and it was necessary to elect a secretary who would. As an indication of his fraudulent appointment, plaintiffs' learned counsel state that he had only worked for the company about a year and was only 23 years old when appointed. We see nothing fraudulent in this fact, or any other fact in the record.

*Displacement of Secretary.*

The plaintiff Edward J. Walsh was appointed secretary in 1907, when he had only worked for the company about two or three years, and was only about 24 years of age. Counsel say in their brief: "Whom did he displace? Lodwick, who had been secretary at least since 1897 and who knew all about the notes and pledge of and option on the stock; who knew the financial affairs of the company better than any other man alive, not even excepting Humphreys; who had known Humphreys and Edward Walsh, Jr., even before their college days, and who, as the correspondence shows, attended upon the interests of Edward Walsh, Jr., 'even as the eyes of servants look unto the hand of their master' (Ps. 123:2). Lodwick, who conducted all of the correspondence from St. Louis, and knew Humphreys, and the facts in connection with the stock ownership like a book, is thrown out of the office of secretary, and Robert A. Walsh, 23

years old, connected with the company less than a year is installed in his place. What does this mean? . . . It indicates that something is contemplated in connection with the office of secretary not in keeping with Lodwick's knowledge and fidelity. It never would have done to have had Lodwick sit as secretary alongside Julius Walsh and transfer to Julius Walsh 113 shares of stock belonging to the estate of Edward Walsh, Jr., without money or price, without a scrap of paper, evidencing the right of the transferee and without any explanation even. He *knew too much, and "his fidelity would have paralyzed his hand that held the pen."* While it is true that Lodwick was succeeded as secretary, he was still retained or was given the office of treasurer of said company, and did all of the work of filling up the certificates for the stock as allotted at the meeting of February 6, 1902. He attended to procuring the signature of Julius S. Walsh, as president of the company to such certificates, and in a letter signed by him as treasurer, and put in evidence by the plaintiffs, he transmitted to Edward W. Humphreys the certificates issued to him. It further appears that Lodwick lived and remained with the company in daily contact with plaintiff Edward J. Walsh, until three or four years before the trial, and that he must have recognized the division of the stock into three parts, which he participated in consummating, as just and rightful, as there is no evidence that he ever protested or indicated anything to said plaintiff Edward J. Walsh, or to anyone to the contrary.

We are satisfied that Lodwick would no more have written up and procured the execution of the said stock certificates, as treasurer, than as secretary, had he known plaintiffs were in anywise defrauded thereby, or Julius S. Walsh not entitled thereto; and the fact that he participated in carrying out said division of the stock in any capacity, and always acquiesced therein, considering the character of the man, his relations to the parties and his familiarity with the facts, as admitted and claimed by both the plaintiffs and the defendants,

strongly appeals to the conscience of the court, that it cannot go astray in following the lead of Lodwick.

VI. (a) Nor is it specially remarkable, as contended by appellants' learned counsel with great earnestness, that this agreement to divide the stock was not in writing, and was allowed to remain unexecuted, except by a verbal understanding that it was considered executed, during the lifetime of Edward Walsh, Jr. The evidence and petition show that all of the parties were closely related and had the utmost confidence in one another and considered their word as good as their bond. Julius S. Walsh took no notes nor obligation for the money he loaned his brother and Humphreys until 1897, when Edward Walsh, Jr., went to Europe. He commenced loaning money to them in 1891, and continued to do so every few months every year thereafter until 1897. Those were the days of "hard times," which tried men's souls in business, as will be remembered. The aggregate of his loans up to 1897 was the amount of the two notes, one for $31,126.50 and the other for $16,020, for which he had nothing to show for six years, but the word of Humphreys and Edward Walsh, Jr., that they were obligated to pay him. The loans, it is true, were credited to Julius S. Walsh on the books of the company, as owing to him by the company, but he never had a note of the company, and undoubtedly looked alone to his brother and Humphreys for his pay. So, even the stock-holding between Humphreys and Edward Walsh, Jr., rested to a substantial extent in parol. There was no regular stock book at all, and the certificate book always showed that Humphreys owned 100 shares more than Edward Walsh, Jr., when the fact was, no doubt, that each always owned one-half of the stock, as testified to by Humphreys and as shown by the fact that one-half the profits of the company was credited to each. Indeed, it was only through letter-press copies of letters of Lodwick, shown in evidence, that the certificate book was at all useful as showing the stock ownership,

*Loose Methods.*

because all the certificates were attached to the stubs and thus did not show delivery, which was only shown by Lodwick's letters. Also, Julius S. Walsh neglected to call for the certificates for the 300 shares he held under option and pledge, during the lifetime of Edward Walsh, Jr., but always left them with Lodwick. Such loose methods of doing business amongst close relatives and friends are not infrequently evidence—not of fraud—but of that absolute confidence in one another without which this world would be a sordid place indeed.

(b) It is also strenuously urged that there is a material variance between the explanation made by Julius S. Walsh and Edward W. Humphreys, at the meeting with plaintiffs' lawyer, Cutcheon, in 1915, touching the manner in which the former acquired his stock, and the testimony at this trial. But we have carefully examined the record in that regard and find no substantial difference. As appears from Cutcheon's testimony, that occasion did not call for details, and the general statements made by Julius S. Walsh and Edward W. Humphreys at that time were in accord with the testimony at the trial of this case.

*Inconsistent Explanation.*

(c) Nor do we find, as claimed by learned counsel, anything in the letter of October 18, 1901, of Julius S. Walsh to Humphreys, refusing to endorse for the company until his *"holding* with the company *is settled,"* inconsistent with the existence of the parol agreement to divide the stock. He had not yet received his certificates for one-third of the stock, and to that extent, his holdings was "unsettled." The language quoted, it seems to us, is a statement that he has a present holding in the company and desires to have it confined and fixed, i. e., settled by the issue of his certificates therefor.

*Inconsistent Demand.*

(d) Nor do we think that the lower court erred in giving weight to the general business standing of

Julius S. Walsh and his intimate and affectionate relations with his deceased brother and the
<span style="margin">Character as Evidence.</span> plaintiffs, as shown by the petition and the evidence. While it is not admissible to allow direct testimony of the good reputation of a party, unless attacked, to bolster up either his testimony or his cause, yet the triers of the facts, whether judges or jurors, necessarily consider the just inferences to be drawn from the character and relations of the parties, as shown by the facts and circumstances in the record. If a man has reached the age of 75 years and has during a long business career been connected with many large enterprises, and has so conducted himself as to meet with approval of his fellow men, as shown by the circumstances in the case we see no reason why this should not be weighed in his favor, when he is charged with gross wrong doing. If not, why should it have been written, that "a good name is rather to be chosen than great riches?" So, it is contrary to nature for a man to despoil the widow and child of his dead brother, with whom he had always lived upon the most intimate terms of friendship. Indeed, it is a maxim, that "one day makes no murderer nor swindler of his brother;" and that of all the relations of human life none is "closer than a brother."

(e) Nor do we regard it unusual that when Edward Walsh, Jr., was stricken with his last illness, the matter of the stock-holdings was not formally fixed, so as to leave no loose ends after his death. While he was seriously sick for some months before he
<span style="margin">Anticipating Trouble.</span> died, he seems to have been busy with the affairs of his company up to the last moment and died away from home. He left no will. He did not perhaps anticipate death so soon or at all. But few men do. And if his family and brother realized his condition, which, too, is not usually the case, would they not rather let things be at loose ends so far as their interests were concerned, than remind him that he was likely to die and they wanted their interests fixed up

so that they would suffer no trouble nor inconvenience by his death? We think so.

(f)   It is also argued that it is incredible that Julius S. Walsh complained in 1898 that the credits in the books of approximately $200,000 each, to Edward Walsh, Jr., and Edward W. Humphreys, were unjustifiable.   These credits consisted of a lump

Complaint of Book Credits.   sum of $102,343.36 credited to each on the 31st day of December, 1891, as profits made by the company from the beginning of the business, and $12,500 credited at the same time as increase in the value of the "pot department;" a credit of $14,836.36 on December 31, 1892, as profits for that year; also a credit to each of $62,750 on the 31st of December, 1895, as increase in the value of the property of the company.   We think Julius S. Walsh was justified in complaining of such credits, both as a creditor and holder of a pledge and option on their stock.   The record fails to show that these credits were other than book profits, at the time they were made, or that the increase, in value of the property was anything but an estimate.   Besides, the record affirmatively shows that there was a loss of $70,000 during the years 1893 to 1896, and that one of the most depressing periods in business existed during said years.   To credit the shareholders of a manufacturing establishment in 1895 in the midst of such period of heavy loss and depression with an increase in value of its property of $125,000, or more than one hundred per cent of its capital stock, after having credited all its profits from the beginning of its business to such shareholders in 1892, would, on its face, seem unjustifiable, and require proof of the fact of such increase other than a mere entry on the books. It is true, that the payment of dividends is largely in the discretion of the directors, but as to creditors their security cannot be impaired thereby.   And even as amongst stockholders, it cannot be said that a dividend can be justly declared by a going concern, except from *surplus* profits, i. e., profits not necessary for the efficient and profitable conduct and maintenance of the business

and which can be paid presently, or in the near future, without injuring or impairing the company.

In this case, Humphreys and plaintiff's witness, Baldwin, say that the company made no real money until the year Edward Walsh, Jr., died. Mrs. Walsh testified that her husband was greatly worried until within three or four months of his death, on account of the financial condition of the company brought about by Humphreys withdrawing so much from the company, which he told her impoverished the business. Yet, on December 31, 1901, the year Edward Walsh, Jr., died, Humphreys still had about $59,000 of these credits to his credit. So, it is significant that during his lifetime, Edward Walsh, Jr., only drew $57,000 of his credit of $200,000 on the books. In other words, the company could only pay about one-half of these credits in nine years after the larger part was credited to the stockholders, and then only by distressing or impoverishing the company.

It is also significant that after 1898, when Julius S. Walsh made the complaint, no further credits, as profits of the company, were put to the account of either, although profits were made, according to the books, in 1898, 1899 and 1900, aggregating $145,000. It is true that these credits were not stricken from the books, and that Humphreys subsequently, after the death of Edward Walsh, Jr., drew moneys from the company, which were charged to this account and made it overdrawn by some $17,000; and that finally in 1904, the $143,000 still to the credit of Edward Walsh, Jr., was paid by the New York company under its contract to pay the liabilities of the Missouri company. All of this, however, does not show that these credits were justifiable when made, or in 1898, when complained of by Julius S. Walsh, or that he did not complain thereof, but does show a loose method of doing corporate bookkeeping by which both Humphreys and the estate of Edward Walsh, Jr., may have received more than was

justly coming to them, as between them and Julius S. Walsh.

We have carefully considered all of the contentions of the very able brief of appellants' learned counsel, but, in view of the facts and circumstances shown in evidence, the compelling probative force of the explicit testimony of Humphreys and of the silent witness, Lodwick, remains not only unimpaired, but is sustained and strengthened, and constrains this court to find, as did the lower court, that the parol agreement to divide the stock into three parts was made as claimed by defendants.

VII. (a) But, it is argued by appellants' learned counsel that said agreement to transfer to Julius S. Walsh one-third of the stock, not being in writing and never having been executed nor carried out by either party during the lifetime of Edward Walsh, Jr., except by mere word of mouth, was, under the Statute of Frauds, not susceptible of enforcement, either in law or in equity, after his death. This may be taken as true. But we do not deem it necessary to pass upon that point, but will assume there was no such delivery of the stock to Julius S. Walsh under the parol agreement as owner in the lifetime of Edward Walsh, Jr., as to take the case out of the Statute of Frauds, although he had possession of more than is sued for of plaintiffs' stock, as we shall see, *as pledgee and holder of the option to purchase*. This is a suit in equity for an accounting of the profits made or alleged to have been made out of the 113 shares of stock alleged to have been converted by Julius S. Walsh, and not a suit at law for the conversion of the stock. Such a case is altogether ruled by broad equitable considerations—there is no sticking in the bark—and all the facts and circumstances in the case, as bearing upon the equities of it, are taken into view, in order to arrive at a just result. [Albert v. Sanford, 201 Mo. l. c. 132.]

Of course, however, in considering the case, the plaintiffs are bound by the allegations in their petition.

*Executed Agreement.*

Under the allegation of the petition, and appellants' position in this court, Edward Walsh, Jr., did not own one-half of the stock in the Missouri company but only 423 shares plus his proportion of 54 shares, which had been pledged to and stood in the name of other parties, and which plaintiffs claim were treasury shares. His proportion of treasury shares was 23, and the charge in the petition is, that Julius S. Walsh fraudulently converted these 23 shares and 90 other shares, standing in the name of Edward Walsh, Jr., on the books of the company. The evidence shows that two certificates for the 300 shares on which Julius S. Walsh had the option and held in pledge, each for 150 shares, one of which was made to and endorsed by Edward Walsh, Jr., and the other for the same number of shares issued to and endorsed by Humphreys, were in the summer of 1897 sent to Lodwick, with written instructions to hold said certificates subject to the order of Julius S. Walsh. This gave possession in law of such certificates to Julius S. Walsh; although he never called for them during the life time of Edward Walsh, Jr., Lodwick held possession of said certificates for Julius S. Walsh, as his agent. [School District v. Sheidley, 138 Mo. l. c. 688.]

Indeed, the petition expressly states that Edward Walsh, Jr., delivered said certificates to Julius S. Walsh as collateral security. The death of Edward Walsh, Jr., did not terminate this option, and Julius S. Walsh had a right, therefore, to enforce it thereafter, unless it was superceded by some other valid and enforceable contract, and to acquire 300 shares, of which 150 belonged to Edward Walsh, Jr., under the terms of said option, by cancelling his note of $31,126.50 against Humphreys and said Edward Walsh, Jr. Had Julius S. Walsh exercised this option, after the death of Edward Walsh, Jr., instead of taking his one-third of the stock under the parol agreement, he would have secured 37 shares more of plaintiffs' stock than the petition charges he received, and plaintiffs would have had remaining, according to their claim of ownership in the

petition, but 296 instead of 333 shares, which they obtained under said parol agreement. It is true, that plaintiffs would then also have had a claim against the company for one-half of $31,126.50 or $15,563.25. But for said 37 additional shares so received, they acquired 925 shares in the New York company, which the petition alleges was worth par, or $92,500 and which the evidence shows they sold for sixty cents on the dollar, or $55,500 after receiving an average of about five per cent annual dividend thereon for 12 years. This much more than equaled the $15,563.25, which the company would have been required to pay them in case Julius S. Walsh had exercised his option to purchase. Granting, therefore, that, as a strict matter of procedure at law or equity, the parol agreement may not have been enforceable in court after the death of Edward Walsh, Jr., it was binding in good morals, and the plaintiffs have failed to show that they necessarily suffered any injury by reason of dividing the stock in pursuance thereof. It is true, that Julius S. Walsh received 333 shares in said division, instead of 300 shares, which he would have received, had he foreclosed his option, but the extra 33 shares, according to the petition, came from the stock of Edward W. Humphreys, and not from the estate of Edward Walsh, Jr., and the plaintiffs have no cause of grievance on account thereof.

(b) So, plaintiffs make no effort to restore the *statu quo*, and give Julius S. Walsh an opportunity to exercise his option, which he gave up to plaintiffs by carrying out the oral agreement to divide the stock, but cling to the benefits they received by the carrying out of said agreement and his surrender of his option. In effect, plaintiffs do not desire to rescind the transaction entirely, nor in so far as it involved the surrender by Julius S. Walsh of his option on 150 of their shares at about par, which have since become worth many times more, but wish the execution of the parol agreement to stand so far as it involved the surrender of his said option. In other words, they seek to hold

*Doing Equity.*

Julius S. Walsh to the consequences of executing said agreement, so far as it was beneficial to plaintiffs, and repudiate it in all other respects.

Plaintiffs' attitude is untenable. It is contrary to equity. He who comes into equity must not only show that he was damaged and injured by the acts complained of, but must do equity. [Little v. Cunningham, 116 Mo. App. l. c. 549; Baumhoff v. Grueninger, 178 S. W. 102; Albert v. Sanford, 201 Mo. 117; Henderson v. Koenig, 192 Mo. 690, 713; Hanson v. Neal, 215 Mo. 256.]

"While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies." [1 Pomeroy's Equity Jurisprudence (4 Ed.) sec. 398.]

VIII. We hold, that plaintiffs were guilty of laches. We find from the evidence of the witnesses Robert A. Walsh, Arthur J. Baldwin, R. D. Humphreys, C. W. Parker and Edward W. Humphreys and Julius S. Walsh, as did the court below, that Julius S. Walsh expressly informed the plaintiff, Edward J. Walsh, of the manner in which said Julius S. Walsh acquired his stock as early as the year 1904 or 1905, as did also Edward W. Humphreys in 1908. That on different occasions after that, prior to 1915, said plaintiff, Edward J. Walsh, stated to different parties heretofore referred to, that he was dissatisfied with the manner in which his uncle had procured his stock—that he got it practically without consideration.

We also find from the evidence of defendants Julius S. Walsh, Humphreys and Vierling that at the time of the division of the stock on February 6, 1902, Mrs. Walsh said that she knew that Julius S. Walsh owned one-third of the stock, Humphreys one-third, and her husband only one-third, although 423 shares stood in his name on the books. Also, that the day after the hus-

band's funeral she voluntarily stated to Humphreys, as the reason why Julius S. Walsh should become the president of the company and take part in the active management thereof, that he owned one-third of the stock that her husband had informed her how he had obtained it and would wish him to be president.

We are also satisfied from their intimate relations, after the father's death, that whatever either the mother or son knew as to the stock of Julius S. Walsh, the other was speedily acquainted with.

We find also that with full knowledge that Julius S. Walsh claimed one-third of the stock, as soon as the death of his brother called for an assertion of his rights thereto, plaintiffs acquiesced therein for 15 years after the stock was issued to him, and for 13 years after plaintiff, Edward J. Walsh, became of full age. During all of this time plaintiffs procured and received all of the benefits which flowed to the company from the connection therewith of Julius S. Walsh as a stockholder and president of the company. We also hold that, acting on the bona-fide belief that he was the undisputed owner of one-third of the stock and that plaintiffs recognized his ownership, Julius S. Walsh refrained from foreclosing and gave up his pledge and option on 300 shares of the stock, accepted the presidency of the company immediately after his brother's death in 1901, endorsed its paper, at least on one occasion, and thereafter helped maintain its business and credit. That thereby the company paid its debts for which Edward Walsh, Jr., was liable as endorser, amounting to probably $150,000. That Julius S. Walsh also took an active part generally in the management of the company, and assisted in securing the valuable contract with the New York company (which plaintiffs admit they took no part in procuring) by which the plaintiffs exchanged their one-third of the stock in the Missouri company for 25 times as much stock in the New York company, which, after receiving approximately $500,000 in dividends upon it, they sold for $500,000 in 1917. That

plaintiffs had also received in pursuance of said contract with the New York company in 1904, $143,000 in six per cent bonds worth par, on which they regularly received the interest in payment of said doubtful credit of Edward Walsh, Jr., on the books of the Missouri company. If Julius S. Walsh had simply foreclosed his option or pledge, instead of carrying out said parol agreement to divide the stock, and giving his influence and services to the conduct of the business, as he did, we are by no means satisfied that the company would have long remained a going concern, of which it was stated by Humphreys to Mrs. Walsh there was danger unless Julius would help out, or that the estate of Edward Walsh, Jr., would not have been called upon to respond for his endorsements upon its paper, or that plaintiffs, or any of the stockholders of the Missouri company, would have experienced the golden shower, which was precipitated upon them after the death of Edward Walsh, Jr., under the management of the company with Julius S. Walsh as president.

In view of all these circumstances, and the great lapse of time (15 years) prior to bringing suit since the transaction complained of occurred, during which the memory of witnesses may have faded—as Mrs. Walsh admitted on the stand, that hers was fading—and the death of Lodwick and Edwards, the bookkeeper, occurred, who would have been most important witnesses—we hold, that the plaintiffs are estopped by their laches to maintain this suit, and there is no equity in their case. The general rule in such cases is clearly stated, and its application to this case clearly demonstrated in the following quotation from Kellogg v. Moore, 271 Mo. 189, l. c. 194: "It is a familiar doctrine that, apart from any question of statutory limitation, courts of equity will discourage laches and delay in the enforcement of rights. The general principle is that nothing can call forth the court of chancery into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive

and does nothing. The doctrine is founded principally on the equity maxims, 'he who seeks equity must do equity,' 'he who comes into equity must come with clean hands,' and 'the laws serve the vigilant, and not those who sleep over their rights,' and is based on considerations of public policy. Its object is in general to exact of the complainant fair dealings with his adversary, and the rule was adopted largely because after great lapse of time, from death of parties, loss of papers, death of witnesses, change of title, intervention of equities, or other causes there is danger of doing injustice, and there can be no longer a safe determination of the controversy. [See also 10 R. C. L. 396-408, secs. 143 to 157, inclusive.]''

The conclusion we have reached makes it unnecessary to determine whether plaintiffs are not also barred by the Statutes of Limitations and the final settlement of the administrator.

Finding no error therein, let the decree of the learned chancellor below be affirmed. It is so ordered.

*Brown, C.,* concurs, except in par. (a) of Sub. Div. VIII; *Ragland, C.,* concurs.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur, except *Woodson, J.,* not sitting.