This action was brought to recover from defendant plaintiff's damages, alleged to be the sum of $25,000, for medical and hospital expenses and loss of services of his wife, Martha Woosley, occasioned by the alleged negligence of defendant in the operation of a street car upon which plaintiff's wife was a passenger. The answer is a general denial, and furthermore pleads as a bar that plaintiff executed and delivered to defendant, for a valuable consideration, a written release, wherein he released, acquitted, and discharged defendant from any and all liability on account of the alleged claim set forth in the petition, and that plaintiff is debarred from prosecuting his alleged cause of action. The reply denies generally the allegations of the answer, and pleads in avoidance that the release was obtained by fraud and misrepresentation, charging with particularity that:
 "On or about the 19th day of December, 1921, the defendant plotted with and formed a conspiracy with two lawyers (naming them), and by false and fraudulent representations wrongfully, fraudulently, and unlawfully induced him (plaintiff) to sign (by making his mark) four papers, one of which, he has since learned was the so-called release pleaded by the defendant in his answer."
The reply alleges that plaintiff is illiterate and can neither read nor write; that he knew nothing about legal papers or legal procedure, and placed confidence in said attorneys; that the said attorneys did not read to him the purported release or explain to plaintiff the contents thereof or inform him that he was signing a release of his cause of action; that plaintiff received nothing for signing the purported release; and that the paper purporting to be a release and settlement of his cause of action was "a sham, a trick, and a fraud," perpetrated upon him by defendant and said lawyers, and that said alleged release is of no effect and void.
The trial court, at the close of the whole case, gave to the jury a peremptory instruction in the nature of a demurrer to the evidence. After said instruction had been given and read to the jury, but before a verdict had been returned, plaintiff took an involuntary nonsuit, with leave to set the same aside. In due time, plaintiff filed his motion to set aside the nonsuit and for a new trial, and, upon the overruling of said motion nisi, plaintiff was allowed an appeal to this court.
In ruling the propriety of the trial court's action in allowing a demurrer to the evidence, we will endeavor to state from the record before us the facts most favorable to plaintiff. The evidence tends to show that plaintiff's wife was somewhat seriously injured on July 28, 1921, in alighting from one of defendant's street cars, and was confined to bed at a hospital and at home for several weeks thereafter, during which time she was treated by one or more physicians. Shortly after her injury, an attorney called upon Mrs. Woosley at her home, and she signed an agreement authorizing him to represent her in the matter of her claim against defendant arising out of her injury. Subsequently, an associate of said attorney came to see Mrs. Woosley several times regarding her claim, finally resulting in a settlement thereof with defendant. On the afternoon of Saturday, December 3, 1921, the associate attorney came to plaintiff's home with four typewritten papers, and duplicates thereof, as follows: (1) A release of Mrs. Woosley's claim and cause of action, dated November *Page 696 
19, 1921, for an expressed consideration of $4,400; (2) a release of plaintiff's claim and cause of action, also dated November 19, 1921, for an expressed consideration of $100; (3) an affidavit (so-called) to be signed and acknowledged by plaintiff; and (4) a stipulation of dismissal of plaintiff's suit or cause of action. The attorney was accompanfed by a notary public.
The two releases or settlement agreements are in the usual form of such agreements, releasing, acquitting, and discharging defendant and United Railways Company from any and all liability on account of any and all claims and causes of action which the respective parties had arising out of the alleged injuries to Mrs. Woosley. Each of the settlement agreements contains this paragraph:
 "And I hereby declare that I fully understand the terms of this settlement, and that I voluntarily accept said sum for the purpose of making a full and final compromise, adjustment, and settlement of the injuries and damages above mentioned."
Both releases have appended thereto the following:
 "The foregoing release was signed by John F. Woosley (in the one instance, and by Martha Woosley in the other instance) in our presence after being read to/by him (or her) at length,"
 — and purport to have been witnessed by both said associated attorneys. Plaintiff signed his release by affixing his mark thereto. The affidavit is as follows:
"Affidavit.
"State of Missouri, City of St. Louis — ss.:
 "My name is John F. Woosley. I live at 3228 North Broadway. On the 29th day of July, 1921, I retained the firm of (said attorneys) to represent me for the loss of services of my wife, who was injured by reason of an accident, when she alighted from a Broadway street car on the 28th day of July, 1921, at 10:40 p.m.
 "I have settled my case for $100.00, and have signed releases for that sum. I have never retained any other lawyer in this case and I have never authorized the bringing of a suit on this case. I have retained no lawyers but (said attorneys).
 "I am settling my case with full and free knowledge of all the facts and am satisfied to do so for the sum of one hundred ($100.00) dollars, and I am accepting this sum in complete satisfaction of all my claims.
 his "John F. X Woosley." mark
 The affidavit also purports to have been witnessed by both said associated attorneys. Appended to the affidavit and also to plaintiff's settlement agreement is an acknowledgment in the following form:
 "Personally appeared before me this 3d day of December, 1921, John F. Woosley, to me well known to be the person who executed the above and foregoing instrument by making an X mark to the foregoing instrument and acknowledged the same to be of his free act and deed for the purposes therein mentioned,"
 — duly attested by the notary public, with his seal of office affixed.
 The stipulation of dismissal of plaintiff's suit is as follows, omitting venue and caption:
 "Plaintiff acknowledges that the above-entitled cause has been fully settled and adjusted between the parties, and hereby authorizes and directs dismissal of the same at the cost of the defendant.
 "Dated at St. Louis, Missouri, the 19th day of November, 1921.
 his "John F. X Woosley." mark
The stipulation likewise purports to have been witnessed by both associated attorneys.
Relative to the signing of the papers, Mrs. Woosley, wife of plaintiff, testified:
 "Q. What did he (the attorney) say to you when he came out there? A. He said that he had — he brought some papers to give me $4,500; that I had to pay all expenses and everything out of it. And I asked him then how much I would have left, and he said, `Something over $2,300' And I said, `Well, I will not sign a scratch unless I get $2,500 at least' And I said, `I think that is little enough to be crippled all your life' And he said, `You sign that, and I will see that you get $2,500, and I will pay all the rest myself' And I signed it. Q. Do you remember how many papers you signed? A. I think I signed four. Q. You can write your name, can you? A. Yes, sir. Q. Can you read? A. I can read, but I can't see very good to read, and I had my son to read it, and he read my release to me. And there were three or four more papers, and I asked him to read the rest, and (the attorney) said it was no use, that they were all alike. Q. Was your husband there at that time? A. Yes, sir. Q. And was there any paper read there, except the one you have mentioned? A. No, sir; absolutely there was not. Q. Was there any conversation there between you and (the attorney), or between him and Mr. Woosley, that you heard about settling his (plaintiff's) claim? A. Yes, sir. Q. What was the conversation? A. My husband said he didn't want to sign any papers, as he had a case pending against the company, and he didn't want to sign it until he saw his lawyer, and my son and the boy that boards there went out to call him up and couldn't get him. And when they came back he told him he wanted him to wait until Monday. And (the lawyer) jumped up, and he said, `I will just tell you what the street car company said, that they didn't give a ____ if he signed it or not, if you don't sign it to-day, you will not get anything' And that was the conversation that (the attorney) had. Q. What did (the attorney) say, if anything, respecting his (plaintiff's) claim, about whether he was releasing it or not? A. He didn't say anything about that; and when my husband said that he didn't want to sign it, he was afraid he would do something against his lawyer, and he said he could get into trouble, and he (the attorney) *Page 697 
said, `Your lawyer can't do anything; you are signing your wife's release' Q. And then I suppose your husband signed these papers? A. Yes, sir. Q. How did he sign them? A. He made his mark. Q. Did your husband get any money that you know of? A. No, sir. Q. Did he get any of the $2,500? Did (the lawyers) give him any money out of this? A. No, sir; they did not."
Cross-examination:
 "There was only just one (paper) read. There was no other one read but one. Q. Where were you at the time that he (the notary) swore him? A. I just heard him only say: `Do you acknowledge this as your signature?' Q. And what did your husband say? A. He told him he did. Q. And did he ask if he knew what the paper was? A. No, sir; I didn't hear him if he did. Q. Did you hear any one tell your husband that in settling your case that they were asking a release from him? A. No, sir."
Charlie Aspille testified for plaintiff that he was present when the release was signed by plaintiff's wife; that "her son read one paper"; that he believed Mrs. Woosley said, referring to the other papers, "What was those others? and (the lawyer), or whoever it was, said it was all just the same; that it was all alike and that it wasn't necessary to read those others." On cross-examination, he testified that plaintiff signed some papers "by making marks, I suppose, but I wasn't watching. All I heard him (the notary) ask him (plaintiff) was if he acknowledged that was his signature when he signed the papers."
Ira Daniels, plaintiff's stepson, testified:
 "Q. What did he (the lawyer) say when he came in? A. Well, he never said nothing; he just brought some papers, and I read one of them. He had four or five of them in his hand, all pinned together. Q. Why did he give you this to read, do you know? A. My mother asked him to. Q. And did you read it? A. Yes, sir. Q. And what was the one you read? A. It was a release of her suit against the United Railways Company. Q. And what was the amount mentioned in it? A. $4,400. Q. Now, was there any conversation between (the lawyer) and your stepfather? A. No, sir; my mother asked him to let me read the other papers, and he said they were all alike. Q. So you didn't read them? A. No, sir. Q. Well, after you had read that, and he said they were all alike, what happened then? A. My mother signed them, and my stepfather signed them. Q. Who told your stepfather to sign them? A. The notary public and the lawyer."
On cross-examination, he said he did not remember any reason mentioned why his mother was to get $4,400 instead of $4,500, although he called attention to the fact that his mother's release was in consideration of a payment of $4,400. He heard her say that she would not take less than $2,500 for her part. He heard the notary ask his stepfather (plaintiff) if he acknowledged his signature, to which plaintiff said, "I do," whereupon the notary signed the paper and affixed his seal.
Plaintiff testified:
 That he had been injured while in the employ of the Wabash Railroad Company some time prior to his wife's injury, and had employed another and different attorney to bring a suit in his behalf against the Wabash Railroad Company, and the same attorney had also filed, at plaintiff's request, the instant suit, that he can neither read nor write, and is hard of hearing, and that, when his wife's attorney and the notary came to his home on December 3, 1921, plaintiff understood they came to settle with his wife and to get her to sign the papers. "It seems as though they wanted to settle with her and have them papers there for her to sign, but she said she wouldn't sign them without she got $2,500, and (the lawyer) says, `I will see that you get that' Q. And then did she sign them? A. Yes, sir; she signed them. Q. After she signed them, what did (the lawyer) say to you? A. Well, he said in order for her to get her money I should sign them. Q. What did you say to him then? A. I said, `I don't like to sign any papers until I (have) seen my lawyer' Q. What did he say then? A. They talked there, and it seems as though the old woman, my wife, got kind of scared for fear she wouldn't get anything, and I thought rather than for her to be anything out I would sign the papers. Q. Did you make some effort to see your lawyer? A. Yes, sir; the boys went out and tried to call him up. Q. And you didn't get him, though, did you? A. No, sir. Q. And after you couldn't get him, then what did you do about signing those papers? A. Well, I signed them; I put my X straight through four papers. Q. Did you get any money for signing those papers? A. No, sir; I never got a cent. Q. Did anybody read any of those papers to you? A. Yes. Q. The paper that was read to you, do you remember what it said? A. No, sir; I don't. Q. You don't remember that? A. Ira (plaintiff's stepson) read one paper. Q. What was that paper? A. Well, it was to release the street car company in Martha's case. Q. That is your wife's case? A. Yes, sir. Q. What amount of money, if you remember, was mentioned in that release? A. I couldn't tell you that. Q. You never intended to release your case, did you? A. Why, no, sir. Q. You never intended to dismiss your suit, did you? A. No, sir; I didn't."
On cross-examination, he testified:
 That he had first employed his wife's attorneys in his case against the Wabash Railroad Company, but was unable to say whether he had employed them in the Wabash Case before or after their employment in the wife's case against defendant. That afterward he discharged them and employed another lawyer. That he had never employed his wife's attorneys to represent him in the instant suit.
 "Q. Did the notary public tell you that in order for your wife to get her money from the United Railways Company that you would have to sign a release of your claim against the United Railways Company? A. No, sir; I (he) never did. Q. He didn't say anything of that kind? A. No, sir. Q. Did any one else tell you that? A. Not that I know of, but I thought *Page 698 
I signed it for her to get her money. Q. You thought you signed it for her to get her money? A. Yes, sir. Q. You said you didn't want her to be knocked out of her money, so you agreed to sign the papers; that is, the papers presented to you? A. I signed the papers. Q. Do you mean to say that you did not get $100 out of this case? A. I can say I never got a penny out of it. Q. Were you present at the time that your wife came down to the office of (her attorneys)? Did you come down with her? A. No, sir; I didn't. Q. Were you ever down there? A. No, sir. Q. Were you there when the money was delivered to her? A. No, sir. Q. Did you see the check that she got? A. No, sir. Q. You didn't see any of it? A. No, sir."
The attorney who obtained plaintiff's signature to the release papers testified:
 "I don't know everything that took place; but I remember that Mr. Woosley wanted to consult (plaintiff's attorney of record) about this thing, and so he sent the boys to call up (plaintiff's attorney), and I guess they were gone 15 or 20 minutes; and I had been explaining these things and had read them over, and they were all read over to them, and when they came back, one of the boys — I believe it was her son — said that (plaintiff's attorney) wouldn't come up or something to that effect, and Mr. Woosley said well, then, that he was going to go ahead and settle his case; that he was tired of fooling with him, and she said, `Well, I think you had better too; he has lied to you now seven or eight times, and you had better get it settled'; and with that we signed up the releases and stipulations.
 "Q. And how was it signed? A. With his mark. Q. And who wrote his name? A. I wrote his name. Q. Now, after these releases were signed, when was the next time that you saw plaintiff and his wife? A. The next Monday, December 5th, I went up to the house and got them and took them down to our office. They waited there in the office while I took these releases out and got a check from the United Railways Company, and then I brought the check back, and (my associate) gave them a check for their part of it. The check was made out to Mr. and Mrs. or John and Martha Woosley, I believe, is the way it was written out. Q. I will show you a file of this court marked `Stipulation for dismissal,' filed December 6, 1921, and will ask you to look at that paper and state whether or not you had that paper with you at the time you were there? A. Yes, sir; we had this there. Q. And was that signed by the plaintiff in this case, John Woosley? A. Yes, sir. Q. Was that explained to him as to what it was? A. Yes, sir. I explained this had to be filed in order that this case might be dismissed. Q. Were all of the papers which were executed on the 3d day of December read, before they were executed, to the people who executed them? A. Yes, sir; unless some of these stipulations. I don't know whether there were two carbons or not. I didn't read over only one of them, as they were all alike. Q. All original papers were read? A. Yes, sir. Q. But you had copies which were executed, or papers which were executed in duplicate? A. Yes, sir. Q. But the original of each paper was read? A. Yes, sir."
Cross-examination:
 "Q. That is what you want the jury to understand, that you represented him (plaintiff) in his claim against the receiver for the injuries to his wife? A. When his wife gave us her case, Mr. Woosley was right there, and (my associate) says, `We will handle your case right along with hers;' and Mr. Woosley says, `That is all right; we want you to take care of all of us' Q. You represented both of them, did you? A. Yes, sir. Q. Why did you have him acknowledge his signature and not her signature? A. Well, I just told you that when anybody can't write his name we take a notary public there. Q. And you had him make an affidavit, as you call it, that you represented him, but you didn't have her make one that you represented her? A. No, sir. Q. And did you know that he had an attorney of record in that case? A. Yes, sir. Q. You knew that you were not the attorney of record? A. Sure. Q. Did you ask Mr. Woosley why he had filed a suit after you had been representing him? A. Yes, sir; he said this fellow had been running after him and wanted to handle this part of his wife's claim. Q. Well, you knew you weren't the attorney of record? A. Certainly. Q. But nevertheless you had Mr. Woosley sign a stipulation dismissing that case, didn't you? A. Yes, sir. Q. And you gave her $2,500, didn't you? A. Well, we made her — he and her — a check for that amount. Q. And that is what you gave her, wasn't it? A. I don't know whether she took all of it or whether she gave him what was coming to him. Q. You didn't give him any money on his claim at all, did you? A. There was no check given him personally; no, sir. Q. Do you have any excuse to offer why (the associate's) name appears on all these papers as a witness? A. That day when they were in our office, that Monday morning, he discussed it, and we settled on the release and stipulations, and he talked with them, and he asked them if they understood it all, and if they signed these papers, and they told him that they had. After they told him that they understood everything, and it had been explained to them, he (the associate) signed them."
The associate attorney of Mrs. Woosley testified:
 "My recollection of it was about the 5th of December, 1921. It was on a Monday morning. They (plaintiff and his wife) were both in my office at the time. I asked Mrs. Woosley if that was her signature and if she had agreed to settle for that consideration, and she said that she had, and I asked Mr. Woosley if that was his mark and if he had agreed to settle for that consideration, and I asked if they understood that $4,500 was on both the plaintiff's claim, Mrs. Woosley, and the loss of service claim of John Woosley, and that they were being settled in full, because, if these releases were signed and they acknowledged them before me, that was the end of it, and they said they both understood it and wanted to settle it. They sat in my office, and I sent (my associate) out to the street car company to get a check, or rather two checks, and he brought back a check, and payable, as they customarily make them, for $4,400 and a check for $100 to us, as attorneys, both of which checks we showed to them. And I then gave them my *Page 699 
check. I have forgotten the amount, but I think it was $2,500.
 "Q. I will ask you if you paid all of the expenses that are stated? Did you pay the hospital bills? A. All those expenses were paid out of that settlement, and the doctor bills were all paid out of the settlement. Q. All of the liabilities of the plaintiff, John Woosley, were paid out of it? A. Yes, sir; all were paid out of the settlement; every cent of them."
Cross-examination:
 "I settled this case, and I negotiated it myself. I explained to both of them that there were two separate cases or causes of action; that she had an injury and a cause of action because of it, and that, because he was married to her, he had a cause of action for loss of services and her expenses, and they understood that thoroughly. Q. Who drew that paper (the affidavit)? A. My stenographer drew this paper and I dictated it? Q. What did you dictate it for? A. For the reason that the United Railways Company insisted that, if this case was settled, we take an acknowledgment from Mr. Woosley to the facts set up in this statement. Q. Because they knew you didn't represent the husband? A. They didn't know that at all, because we did represent him. (Plaintiff's attorney of record) had managed to, somehow or other, I don't know how, to file a suit on the husband's case, because he told the husband — as the husband told me — he told the husband that, because he didn't sign a written contract, which he couldn't sign except by a mark, that therefore he could go ahead and take that case, and he then filed the suit. That is what the husband (plaintiff) told me when he same in to see me, but that he was sorry that he did it and wanted to settle his case, and the United Railways Company insisted that we get a statement from him to the effect that he made to me, and there was no question but that these statements that he made to me were true. He said that to me, and I embodied in the statement just what he told me, and had a notary public swear him to it. Q. You got that at their suggestion, did you? A. They insisted on this being in the record. Q. Did they also insist on you taking a notary public up there? A. Yes, sir; on account of his making an X mark. That is customary and they insisted that it be acknowledged. Q. And they insisted that you take a notary public up there to get the releases? A. Yes, sir; and we did. Q. And when you got this money you gave a check for $2,500 to whom? A. I don't remember. They were both there, I think I gave it to both of them. I couldn't say that positively, because I don't know; but my recollection is that I did. I don't know where it (the check) is; I have been looking for it. When I moved I destroyed all of my old checks, I suppose, as I had no reason to keep them, and I wasn't able to find this check. Q. They were both present when the check was delivered? A. Yes, sir; and understood that it was final, because I asked them that before I gave them any check."
The notary public testified that he took and certified the acknowledgments made by plaintiff of the execution of his release and affidavit; that "there had been some discussion and quite a number of papers read to them"; that he asked plaintiff if he understood what the release was for, and if he acknowledged the X mark as his signature, and plaintiff answered, "Yes"; and that the contents of the affidavit were explained to plaintiff, and witness asked plaintiff if he was familiar with the contents, and asked plaintiff to raise his hand and swore him.
Defendant's general claim agent testified:
 "We had considerable negotiations for the settlement of that account, and finally it was agreed upon that the two matters would be disposed of for $4,500, and, when the settlement was finally arranged, I arranged to have the two settlements divided, one for $4,400 and one for $100, and the stipulation — I required a notary public to swear Mr. Woosley because he signed by mark. I asked them to have the affidavit of Mr. Woosley obtained, not only as to the signing of the releases, but as to the fact that he had not employed (the attorney of record), because he had filed a suit in behalf of Mr. Woosley while the negotiations were being concluded with (Mrs. Woosley's attorney).
 "Q. Did you know that a suit had been filed by (plaintiff's attorney of record) against the United Railways Company, claiming representation of Mr. Woosley? A. Oh, yes; and that was why I insisted that the affidavit be obtained from Mr. Woosley that he had not employed (the attorney of record). I did that, of course, because under the Attorneys' Lien Act we were called upon to respond in a certain per cent. of any amount paid where the attorney had established a lien in a proper manner, and that was one of the reasons why this settlement was divided, in order that we would establish finally a basis for computing any lien that he might have."
Two checks were drawn in settlement, one for $4,400 and the other for $100, payable to the attorneys making the settlement.
Cross-examination:
 Q. Now you knew, or you say you knew, that this suit was pending. Did you ever discuss that question with (the attorney of record)? A. No, sir. Q. Why not? A. Because he never came to see me. Q. And you didn't come to see him? A. Certainly not. Q. So you just settled with (Mrs. Woosley's attorneys)? A. Yes, sir. Q. Did you ever ask them whether they had a contract with this man (plaintiff) or not? A. They said that they represented him. Q. Did you ever ask them whether they had a contract with this man? A. I don't recall. Q. Now they told you that they had no contract with him? A. I asked them particularly as to their representing Mr. Woosley, in view of (the attorney of record) having brought the suit, and they said that they did. Q. But isn't it true that the fact that you knew that they didn't represent — A (interrupting) I didn't know it, and you know I didn't know it. Q. Isn't it true that one of the reasons why you demanded this acknowledgment was that you thought they didn't represent him? A. I did not. Q. That is not the reason? A. That didn't enter into it at all. They said that they did represent him, and I assumed that they did. I said I wanted one because of the fact that he had brought suit, and I wanted to show that he wasn't employed in the case as they had said. *Page 700 
I tole them I wanted an affidavit from Mr. Woosley to show that he didn't employ (the attorney of record)."
I. Appellant contends that the trial court erred in failing to submit to the jury the issue of fraud and misrepresentation in the procurement of the release raised by the pleadings. He insists that the issue is one of fact, and that therefore it was a question for the jury whether, upon the foregoing evidence, the release of appellant's cause of action was procured through the fraud and misrepresentation of defendant. Respondent, on the other hand, contends that there is no evidence connecting defendant with the fraud or misrepresentation (if any) in the procurement of the settlement agreement, nor is defendant chargeable with notice of any fraud or misrepresentation; hence that the trial court properly directed a verdict for defendant.
The gravamen of plaintiff's reply is an alleged conspiracy between defendant and the two lawyers who procured plaintiff's signature or mark to the release agreement. Plaintiff alleges with particularity in his reply that:
 "The defendant plotted with and formed a conspiracy with two lawyers, * * * and by false and fraudulent representations wrongfully, fraudulently, and unlawfully induced him to sign (by making his mark) four papers, one of which, he has since learned, was the so-called release pleaded by the defendant in his answer."
The evidence is insufficient in our opinion, to support the foregoing specific averment of the reply. The evidence fails to prove a conspiracy between defendant and said lawyers, or that defendant had notice or knowledge of fraud or misrepresentation on the part of the two lawyers, if any there was, in the procurement of the release. At most, the evidence tends to show that the two lawyers concededly represented plaintiff's wife: that they had some preliminary negotiations with defendant's claim agent looking to the settlement of Mrs. Woosley's claim or cause of action; that the lawyers told the claim agent that they represented plaintiff as well as his wife: that the claim agent knew that a suit had been commenced upon plaintiff's cause of action by another and different lawyer; that the claim agent agreed upon a settlement of both causes of action for $4,500, that of the wife's cause of action being for $4,400, and that of plaintiff's cause of action being for $100; that one of the purposes in dividing the amount of settlement was to establish a basis for computing the amount of the lien of plaintiff's attorney of record in the pending suit; that the claim agent insisted upon the two lawyers procuring from plaintiff an affidavit, sworn to before a notary public, that plaintiff had not employed the attorney of record to commence the instant suit; that the affidavit was dictated by one of the two lawyers and written in the lawyer's office by his stenographer; and that subsequently the signed releases and the affidavit were delivered to defendant's claim agent, who thereupon issued defendant's two checks in settlement of the two causes of action, one for $4,400 and the other for $100, payable to the two associated lawyers. There is no evidence that defendant or his claim agent had any information or knowledge of what was said or done by the two lawyers at the time the releases and affidavit were signed by plaintiff and his wife. Certain it is that defendant's claim agent was not present when the releases were signed by plaintiff and his wife.
In 12 C.J. 639, s 234, it is said:
 "In order to establish a conspiracy, evidence must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Disconnected circumstances, any one of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy. * * * The evidence must do more than raise a suspicion. It must lead to belief."
In Walsh v. Walsh, 226 S.W. 236, 242, 285 Mo. loc. cit. 205, we said:
 "But the burden of proving the fraud or conspiracy charged against the defendant * * * is upon the plaintiffs. They must make out their case against him by clear and convincing evidence. * * * Fraud is never presumed, and while it may be proved by circumstantial evidence, if the transaction relied upon to prove fraud is as consistent with honesty and good faith as with a fraudulent purpose, it will be referred to the better motive. Jones v. Nichols, 216 S.W. 962 [280 Mo. 653]; Garesche v. MacDonald [15 S.W. 379] 103 Mo. 1; Hardwicke v. Hamilton [26 S.W. 342] 121 Mo. 465; Warren v. Ritchie [30 S.W. 1023] 128 Mo. 311."
Allowing to appellant every favorable intendment from the evidence before us, we find no clear or convincing proof that respondent conspired or participated in the perpetration of any fraud or misrepresentation in the procurement of the release or had any notice or knowledge of such fraud or misrepresentation, if any there was, for at most respondent's connection therewith rests upon mere suspicion rather than upon any welldefined evidence to support it. Reed v. John Gill Sons Co., 212 S.W. 43, 201 Mo. App. loc. cit. 461; Homuth v. Street Railway Co., 31 S.W. 903, 129 Mo. loc. cit. 643.
II. Furthermore, we think that plaintiff's own testimony convicts him of such negligence as a matter of law in the execution of the release as to preclude him from challenging the validity thereof. True, plaintiff testified that his wife's lawyer said, "In order for her to get her money I should sign them (the papers)," and that he understood *Page 701 
that the lawyer and the notary came to the home to settle with his wife. Nevertheless he apparently realized or appreciated that, before signing the papers, he should know something about their contents and purpose, for he said at the time, "I don't like to sign any papers until I (have) seen my lawyer." He thereupon sent his stepson to call his lawyer upon the telephone, and, when the stepson returned and reported that he was unable to talk with plaintiff's lawyer, plaintiff immediately signed the papers without further inquiry upon his part as to their contents or purpose and without any request or demand by him that the papers be read or explained to him. He testified, as his reason for signing them:
 "It seems as though the old woman, my wife, got kind of scared for fear she wouldn't get anything, and I thought rather than for her to be anything out I would sign the papers."
On cross-examination, he testified:
 "Q. Did the notary public tell you that in order for your wife to get her money from the United Railways Company that you would have to sign a release of your claim against the United Railways Company? A. No, sir; I (he) never did. Q. He didn't say anything of that kind? A. No, sir. Q. Did any one else tell you that? A. Not that I know of, but I thought I signed it for her to get her money." (Italics ours.)
He testified also that, while one paper was read to him, he did not remember "what it said." His own testimony does not indicate (nor does the testimony of any other witness indicate) that any duress was used in procuring his signature to the release papers, or that all the release papers would not have been read and explained to him had he so insisted. At least two members of his family, his wife and stepson, were present when he signed the papers, and both were able to read. It does not appear from the record that plaintiff requested either member of his family to read or explain the contents of the papers which he signed, or that he requested either the lawyer or the notary to read or explain them, although his own testimony indicates that he had some doubt of the wisdom of his signing them. He apparently knew, also, that defendant, relying thereon, would pay his wife a considerable sum of money when the papers were signed by him, for that is the undeniable purport of his own testimony.
In Anderson v. Drug Co., 130 S.W. 829, 835, 149 Mo. App. loc. cit. 573, the validity of a release was challenged, and Goode, J., speaking to the question, said:
 "It is trite law that a person is expected to learn what an instrument contains before he signs it, either by reading or having it read, or by having its contents stated by some one on whom he has a right to rely, the circumstances considered, and provided either method of obtaining the information is available without too great inconvenience."
In Chicago, St. P., M. O. Railway Co., v. Belliwith (C.C.A. 8th Cir.) 83 F. 437, loc. cit. 439, 28 C.C.A. 358, 361, Sanborn, J., discussing a similar question, said:
 "A written contract of release cannot be annulled or avoided by proof that one of the parties to it, who was sound in mind and able in body, could not read or write, did not know the terms of the agreement, and neglected to ask any one to read it to him when he signed it. A written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement. * * * If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it, unless he has been dissuaded from reading it by some trick or artifice practiced by the opposite party. If he cannot read it, it is as much his duty to procure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so; and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents."
The trial court committed no error in directing the jury, at the conclusion of all the evidence, to return a verdict for the defendant. Accordingly, the judgment nisi must be affirmed, and it is so ordered.
LINDSAY, C., concurs.