James L. FITZPATRICK and Lena M. Fitzpatrick, Plaintiffs-Appellants,

v.

FEDERER REALTY COMPANY, a Corporation, William A. Federer, Lester A. Liebmann, Peter Bouckaert and Elmer A. Sander, Defendants-Respondents.

No. 48279.

Supreme Court of Missouri,

Division No. 1.

Nov. 13, 1961.

Motion for Rehearing or to Transfer to Court en Banc or to Modify Opinion Denied Dec. 11, 1961.

674

J. L. London, St. Louis, Louis L. Hicks, Clayton, for appellants.

James H. Zipf, Fortis M. Lawder, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, for respondents, Federer Realty Co., William A. Federer, Lester A. Liebmann and Peter Bouckaert.

Kappel & Neill, Harry G. Neill, Jr., St. Louis, for Elmer A. Sander.

HOLMAN, Commissioner.

The plaintiffs were formerly the owners of a 100-acre tract of land located on Baxter Road in the western part of St. Louis County. There were valuable improvements thereon which will be hereinafter briefly described. On April 5, 1957, the property was sold to defendant Elmer A. Sander at a foreclosure sale held pursuant to a second deed of trust plaintiffs had executed. Defendant Lester A. Liebmann was an employee of Federer Realty Company and was the trustee in the deed of trust, and defendant Peter Bouckaert was the payee in the $24,000 note secured by said trust deed. William A. Federer and Federer Realty Company, defendants herein, had at one time been agents for plaintiffs in an effort to sell the property and William had acted as agent for Bouckaert in arranging the loan heretofore mentioned.

This suit was filed on April 20, 1957. In the original petition plaintiffs sought to set aside the foreclosure sale and to obtain a declaration that they had a right to redeem; they also prayed damages. They alleged that defendants fraudulently conspired and agreed not to bid against each other, and to divide the profit they intended to make by purchasing the property at a low price and reselling at a higher price. The court sustained defendants' motions to dismiss plaintiffs' petition on the ground that it failed to state a claim upon which relief could be granted. Upon appeal to this court we held that the petition stated a claim for relief and the judgment was reversed and cause remanded. Fitzpatrick v. Federer, Mo.Sup., 315 S.W.2d 826. Thereafter, plaintiffs filed a third amended petition in three counts. The first count was entitled "Action at Law" and sought damages for wrongful foreclosure. The second count entitled "Breach of Contract" prayed for damages based upon the failure of defendants to carry out an oral agreement to withdraw the foreclosure sale and to sell the property privately. Count III entitled "Action in Equity" sought to cancel the foreclosure sale and also prayed damages.

Plaintiffs went to trial on the first count and the jury returned a verdict against all defendants for $35,000 actual damages and $9,000 punitive damages, a total of $44,000. Thereafter the court sustained the motion of defendant Bouckaert to set aside the judgment and enter judgment for said defendant in accordance with his motion for a directed verdict. As to the other defendants the court overruled the motions for judgment but sustained each of their motions for a new trial. The grounds assigned for sustention of said motions varied slightly but the following grounds upon which the motion of William A. Federer was sustained are typical:

"4. There was no substantial or competent evidence to sustain the verdict in favor of plaintiffs and against this defendant. * * *

"6. The court erred in giving and reading to the jury erroneous, illegal, misleading, improper and prejudicial instructions on behalf of plaintiffs,

and erred in giving each and every instruction at the request of plaintiffs. * * *

"11. The verdict is against the greater weight of the evidence. * *

"15. The verdict is against the law and the evidence and the evidence under the law."

Plaintiffs have duly appealed from the aforesaid after-trial orders.

■ Upon this appeal plaintiffs contend that the court erred in entering judgment for defendant Bouckaert and in granting a new trial to the other defendants and assert that the judgment entered upon the verdict of the jury should be reinstated. Defendant Bouckaert, of course, contends that the plaintiffs failed to make a submissible case against him and hence the court properly entered judgment in accordance with his motion for a directed verdict. While the other defendants alternatively contend that the court properly granted them a new trial they primarily assert that the plaintiffs failed to make a submissible case against them and therefore the trial court erred in not entering judgment in their favor in accordance with their motions for directed verdict. This court has heretofore held that where plaintiff appeals from an order granting defendant a new trial, the defendant (although not an appellant) "is entitled to urge upon this court that plaintiff made no submissible case, which point he duly preserved in the trial court by timely trial motions and in his after-trial motion to set aside the verdict and to enter judgment in his favor or in the alternative for a new trial." Wilhelm v. Haemmerle, Mo.Sup., 262 S.W.2d 609, 611.

We will attempt to state plaintiffs' theory of this case. As indicated, the original petition sought to set aside the foreclosure sale. In the first count of the petition upon which they went to trial they also complained of the foreclosure sale alleging that "prior to said sale all of the said defendants entered into an agreement and understanding with each other not to bid against each other at the said foreclosure sale," and that thereafter the defendant William A. Federer agreed that the foreclosure proceedings would be withdrawn but that he, "pursuant to the said concerted action of the defendants, while representing to the plaintiffs that the foreclosure proceedings would be withdrawn, actually had no intention of doing so, and in violation of the said assurances and without notifying the plaintiffs of their intention to do so, proceeded wrongfully, unlawfully, wilfully, maliciously and wantonly to cry the property at foreclosure on the said 5th day of April, 1957, * * * and foreclosed the said property through the said defendant Lester A. Liebmann, trustee under the said second deed of trust, for the purpose of depriving plaintiffs of said property pursuant to an agreement and understanding among all of the defendants that the property was to be foreclosed at a low price and later sold for the benefit of the defendants at a much higher price * * *."

Plaintiffs also alleged that defendants Federer Realty Company, William A. Federer, and Lester A. Liebmann, after obtaining a listing agreement to sell the property in question, "actually made no effort to find a bona fide purchaser but on the contrary discouraged potential buyers from purchasing the same in furtherance of an understanding and scheme to deprive the plaintiffs of the property, knowing that the property was encumbered * * *."

The case was submitted in Instruction No. 1. There were two submissions in the instruction. As a predicate to a verdict for plaintiffs the jury was required to find as to the first submission "that Federer Realty Company and William Federer and Lester A. Liebmann made no bona fide efforts to find a purchaser as set out in the said listing contract and discouraged potential buyers from purchasing the same, and if you find and believe that if the efforts to sell the said property had been bona fide, the property could have been sold in

time to prevent the foreclosure mentioned in the evidence, and in time to have produced a sales price above the indebtedness of the plaintiffs on the said property, then your verdict will be in favor of the plaintiffs and against such, if any, of the three above-mentioned defendants as joined in above described acts."

The findings required on the second submission are that "on or about the 9th day of March 1957, at the time of the auction sale mentioned in the evidence, any two or more of the defendants, Federer Realty Company, William Federer, Lester Liebmann, and Elmer A. Sander, entered into an agreement and understanding with each other not to bid against each other and carried out the said agreement and understanding at such auction sale, and that by reason thereof chilled the bidding, and if you further find that as a direct and proximate result thereof, the attempted auction sale did not produce a bona fide bid which would have been reasonable, and if you further find that the plaintiffs were damaged as a direct and proximate result thereof, and if you further find that anyone, as a direct and proximate result of said alleged conspiracy, if you so find, failed to make bona fide bids at the foreclosure sale mentioned in the evidence, and that the plaintiffs by reason of said acts of defendants, if you so find, suffered damages, then you will find in favor of plaintiffs and against such of the defendants, if you so find, as participated or joined in the said acts." While the meaning of this portion of the instruction is not clear, we have construed it as hypothesizing that the named defendants entered into an agreement not to bid against each other and carried out that agreement (1) at the auction sale and (2) at the foreclosure sale.

Although there was no allegation in the first count of the petition to support the submission in regard to the auction, we will assume for the purposes of this appeal (but do not decide) that the issue so submitted was "tried by express or implied consent of the parties," and it shall be treated in all respects as if it had been raised in the pleadings. Section 509.500 RSMo 1959, V.A.M.S.

We will state the evidence as briefly as possible, although since we will review the question of submissibility we must, of necessity, state the testimony in some detail. The tract of land here involved was known as "Leisure Lea." It was rather extensively improved. The main residence, including servants' quarters, had a total of 14 rooms and 4 and ½ baths. Another two-story building called the "playhouse" had a large recreation room, bath, and kitchen on the first floor and two very large bedrooms and two baths on the second floor. There was also a two-room log house on the premises as well as a combination tool house and bath house. The improvements included a rather large barn and implement shed. Also on the premises was a large swimming pool complete with filtering system, and other appurtenances. The premises were apparently well fenced and contained outdoor picnic facilities. Running water was provided by a deep well and pumping system. The improvements occupied perhaps ten acres of land, and the evidence indicated that the remaining 90-acre tract was rather rough and hilly and for that reason there was a conflict in the evidence as to its suitability for residential development.

Plaintiffs, husband and wife, acquired this property in January 1953. Prior to that time they had operated a hamburger and root beer stand on Clayton Road with a lease which would not expire for seven years, and owned a home in Richmond Heights. They acquired Leisure Lea from Raymond Muckerman at a valuation of about $97,000. In general, the terms of the transaction were that plaintiffs conveyed their business at a valuation of $27,500, and their home, in which they appeared to have an equity of about $10,000, to Mr. Muckerman and gave him a first deed of trust upon Leisure Lea for $60,000. The documentary stamps on the deed, however, indicated a

consideration of $82,000. Plaintiffs occupied the residence on the premises and rented the playhouse and other facilities to various persons and organizations for picnics, parties, and other recreational purposes. There was testimony that in 1955 they grossed $11,000 from those rentals.

Plaintiffs, however, did not prosper. During a part of the time they owned these premises they engaged in a wholesale chili business which was not successful, and also apparently spent considerable money prospecting on their land for uranium which was not found to be present in commercial quantities. Beginning in the fall of 1953 or the spring of 1954 plaintiffs began making efforts to sell this property. It was listed with various real estate brokers but they were never able to sell it. It would appear that in the first part of 1956 they received a bona fide offer from one Wenneker involving an exchange of property which plaintiffs seriously considered but finally refused to accept because the purchaser would not agree that they could reserve 50% of the mineral rights. In February 1955 plaintiffs borrowed $13,400 from Larry Seeman and gave a second deed of trust to secure said loan.

The first contact plaintiffs had with defendants was in February 1956. At that time Mrs. Fitzpatrick called the Federer office and talked with Mr. Liebmann concerning some property he had advertised for sale. In that conversation he learned that plaintiffs desired to sell their property and also needed a loan to take care of the second mortgage, delinquent taxes, and other items. Shortly thereafter Liebmann took Mr. Federer to Leisure Lea where they looked at the premises and discussed the situation with Mrs. Fitzpatrick. As a result of that conference Mr. Federer obtained a $24,000 loan for plaintiffs from defendant Bouckaert. Plaintiffs paid Federer Realty Company a commission of $1,000 for obtaining the loan and gave the company an exclusive listing, for a period ending October 31, 1956, to sell Leisure Lea. From the proceeds of the loan plaintiffs

had $5,757 remaining after payment of the prior second mortgage, taxes, and a past due installment on the first deed of trust. The listing agreement (dated February 15, 1956) authorized a sale of the property for $150,000 for the whole tract, or $89,500 for the improved 10 acres and $90,000 for the unimproved 90 acres. The commission provided in the agreement was 5% of the sale price. Shortly thereafter the realty company placed a "For Sale" sign in a wooded section of the premises facing Baxter Road but Mrs. Fitzpatrick did not like the location thereof and had it moved to another part of the property.

Mr. Liebmann was the listing agent for the realty company and had the primary responsibility of attempting to sell the property. Mrs. Fitzpatrick testified that as far as she knew neither Mr. Liebmann nor Mr. Federer ever brought any prospective buyer out to look at Leisure Lea; that she and Mr. Liebmann had frequent telephone conversations and she furnished him with the names of all persons who had ever appeared to be interested in purchasing the place.

Federer Realty was not successful in selling the property during the period of its exclusive listing. After the listing expired the plaintiffs began dealing with other real estate agencies and continued their efforts to sell the property. On January 3, 1957, plaintiffs defaulted in the payment of an installment due on the first mortgage. The 1956 taxes on the property were unpaid and delinquent. On February 15, 1957, plaintiffs defaulted upon the second deed of trust. Mrs. Fitzpatrick testified that at that time she and her husband went to see Mr. Federer and asked for an extension of time but that it was refused. She said Mr. Federer suggested that he might arrange another loan for five months for another commission of $1,000 but they would have to give him an exclusive sales listing for one year. Plaintiffs apparently did not make any effort to obtain another loan but decided to hold an auction and attempt to sell the property in that way. The sale was

held on March 9, 1957 in the large room in the playhouse on the premises. Plaintiffs had expended about $2,500 in advertising the sale. It was advertised in a number of newspapers and they also prepared a brochure which was sent to all persons who had indicated an interest in the property. No foreclosure proceedings were commenced by the holder of either the first or second deed of trust until after the sale was held. About 60 or 70 persons attended the auction. Mr. Fitzpatrick conducted the sale. Prior to the auction defendant Sander had looked at the property and had talked with plaintiffs concerning it. Mr. Federer and Mr. Liebmann attended the auction and were sitting together, and when Mr. Sander came into the room Mr. Liebmann got up and gave Sander his seat. After Mr. Fitzpatrick had described the property he called for bids. A Mrs. Lehr bid $85,000 and thereafter Mr. Sander bid $86,000. Plaintiffs presented evidence that after Sander had bid $86,000 Mr. Federer spoke to him in a loud whisper and said, "Bid $100,000 and stand pat for awhile." This whisper is the main evidence relied upon by plaintiffs in contending that the defendants "chilled the bids" at this auction. No other bids were made and finally Mr. Fitzpatrick called off the sale.

A few days after the auction foreclosure proceedings were commenced on the second deed of trust. The sale was held on April 5, 1957. Present at the sale were plaintiffs and their attorney, defendants Sander, Federer, and Bouckaert. Defendant Liebmann was the trustee conducting the sale. Also present were Henry Haffner, a real estate broker who had made an effort to sell the property, and Sam Duke, owner of the notes secured by the first deed of trust. Prior to the sale plaintiffs served a notice of redemption on the trustee and this was read at the sale. When bids were called for Bouckaert bid $25,000 and Sander bid $25,050, and the property was sold to him for that price. This sale, of course, was conducted subject to the encumbrance of the first deed of trust and the delinquent taxes. After payment of the expenses of the sale there was a deficiency of $112.35 upon the amount due Bouckaert.

About March 21, 1957, plaintiffs had received a letter from Father Francis P. Crane, representing the LaSalette Mission Seminary, indicating an interest in Leisure Lea for the establishment of a school. Shortly thereafter Father Crane looked at the premises and indicated a definite interest in the property. Two days before the foreclosure sale one of the plaintiffs called him at Jefferson City and made a final offer to sell the property for $100,000 and, according to the testimony of Mrs. Fitzpatrick, he stated he would take it. On the morning of the foreclosure sale Mr. Fitzpatrick prevailed upon Mr. Federer to telephone Father Crane and Mr. Fitzpatrick listened on an extension phone. Fitzpatrick testified that in that conversation Father Crane asked Federer to hold off foreclosure until he could notify headquarters in the East and that he would take the property at $100,000; that Mr. Federer had replied that Father Crane could have the property and that he, Federer, would take care of the Fitzpatricks. Fitzpatrick's testimony as to that conversation was disputed by both Federer and Father Crane. Immediately thereafter Federer advised Mr. Fitzpatrick that the sale would not be postponed and it was held shortly after noon on that day.

Mr. Fitzpatrick testified that a few days following the foreclosure sale Mr. Sander came to their place and offered to buy the equipment at a price of $2,500 if plaintiffs would vacate the premises by May 1. He testified that in that conversation Sander also stated that if Father Crane bought the place he would give plaintiffs one-third of the profits and that he, Sander, would keep one third, and would give Federer one third because of his connection in the deal previous to that time; that on the following Saturday Mr. Sander brought out a written proposal and showed it to them, but when they did not immediately accept the

proposition he refused to let them keep the paper and took it with him when he left.

Nettie Brockmeyer, a real estate agent, testified for plaintiffs and stated that in her opinion Leisure Lea, at the time of foreclosure, was worth $150,000. She also testified that she had a client interested in obtaining property in that area at a price of from $125,000 to $150,000; that she had called the Federer office and asked the price of plaintiffs' property and some unidentified person quoted it at $200,000.

William S. Bahn, an attorney, testified that he was a close friend of plaintiffs and had informally negotiated for the purchase of Leisure Lea. He said he had told the plaintiffs that he would be interested in the property at around $100,000 and "they were very candid and blunt about it and said they wouldn't consider that at any time." This witness also stated that two or three months before the foreclosure he called Mr. Federer and asked the price of the property and was told that it was $140,000. He told Mr. Federer that he was interested in the property at from $90,000 to $100,000 and Mr. Federer said it wouldn't do any good to make that offer because it wouldn't be acceptable to plaintiffs. Mr. Bahn testified that he then outlined to Mr. Federer the reasons he thought the property was worth no more than $100,000 and Mr. Federer replied that his views were probably based on "good logic and good reasoning but he knew they would not be interested."

Plaintiff also presented the testimony of Eugene H. Bruns, a real estate appraiser, who was of the opinion that the property had a reasonable market value of $170,000 on the date of foreclosure.

Mrs. Fitzpatrick testified that immediately after the foreclosure sale Mr. Federer said to her, "If Father Crane buys the property you will be taken care of." Plaintiffs also read as an admission against interest from the deposition of Mr. Federer the following (relating to a conversation with Mrs. Fitzpatrick on the day of the sale): "I told her that if the LaSalette Fathers came back into the picture, I thought that I might try and prevail upon Mr. Sander to sell it to them and give her something out of it, just some salvage, because she pleaded with me just before the auction [foreclosure] that I should stop the auction [foreclosure]. I told her that it was not in my power." Father Crane did not buy the property. At trial time it was still owned by Sander. The LaSalette Fathers purchased another property in St. Louis from the Sisters of St. Rita a year or so after the foreclosure of Leisure Lea.

Plaintiffs read alleged admissions against interest from the depositions of each of the individual defendants as follows: From the deposition of Elmer A. Sander: "Q. Now, after the foreclosure, did you have any conversation with Mrs. Fitzpatrick about selling the property? A. No, nothing other than they mentioned Father Crane being interested in a portion of it.

"Q. Didn't you have some conversation about selling the property and dividing the profits three ways? * * * A. Not any three ways, no, sir.

"Q. How was it to be divided, if not three ways? A. I think that I told them that if the purchase of a portion of it [by Father Crane] was arranged, I think it was primarily the improved portion, that I would make some arrangement with them to give them a third, if they handled the procedure.

"Q. A third of what? A. Whatever profits."

From the deposition of William Federer: "Q. Now, did you bring any prospects to the Fitzpatricks? A. I personally did not bring any prospects. We advertised the property extensively every Sunday and we ran ads that are larger ads than usual on that type of property. There were inquiries on it; Mr. Liebmann handled some of those inquiries, and he sent people out to look at it, but I personally was not active in the sale of that property.

"Q. Did you know Mr. Sander before then? A. Yes. Oh, I'd say possibly three or four months prior I met Mr. Sander when he purchased a large property through our office.

"Q. And it is your testimony that you had no conversations with him prior to the auction? A. No. * * *

"Q. Now, have you done business with Mr. Bouckaert over a period of years? A. Yes, sir.

"Q. Do you sell him deeds of trust all the time? A. That is right.

"Q. Your relationship has been close, has it? A. Well, it's been a relationship of client and real estate office. * * *

"Q. You never submitted any offer as I understand? A. No, I had no offer personally.

"Q. That was left to Mr. Liebmann entirely, wasn't it, the sale of that property? A. Yes.

"Q. You had nothing further to do with it after you took the listing? A. Well, I had numerous telephone calls which I answered, inquiries about the property from various people, and I spoke to them about the property and tried to sell it to them. * * *

"Q. Do you remember the conversation about making the loan for them for five months? A. There was some discussion about getting an extension on the loan, in February. * * *

"Q. Did you ask them for a commission of a thousand dollars on that occasion? A. No.

"Q. How much did you ask them for? A. I think I said if we financed any—obtained any additional loans from Mr. Bouckaert, we would want a commission of $500.00. * * * They were to give us a sales contract if we made the loan. * * *

"Q. Now prior to the foreclosure, did you discuss the purchase of the property with Mr. Sander? A. Prior to the foreclosure?

"Q. Yes. A. No.

"Q. He never talked to you about the property at all? A. Yes, he talked to me one time and said he was going out to their auction. * * *

"Q. Did you know whether or not Mr. Sander was going to bid at the foreclosure? A. I did not."

From the deposition of Peter Bouckaert:
"Q. Have you bought real estate from him or through him [Federer]? A. Yes.

"Q. Have you bought deeds of trust through him? A. Yes. * * *

"Q. Did you make any investigation to determine the value of the property [Leisure Lea]? A. No.

"Q. At no time? A. At no time.

"Q. You simply took Mr. Federer's word for it, is that right? A. That is right.

"Q. And you say you did not know how big a first mortgage was on the property when you bought this second deed of trust? A. Not exactly, no. * * *

"Q. Now were you present at the private auction that has been discussed here? A. No."

From the deposition of Mr. Liebmann:
"Q. Who did you take out there? A. I took two prospects out there, * * * Mr. Nothum and Mr. Tomich who are developers. They wouldn't even get out of the car. And I took Mr. Frank Ramacciotti, St. Louis attorney, out there. * * *

"Q. What price did you quote Frank Ramacciotti? A. I told him that he could buy the whole thing for a hundred and fifty thousand * * *.

"Q. Did you ever get any bid on it at all? A. No, sir, no bid at all. * * *

"Q. What would you say would be the fair and reasonable market value of it in

1956? A. As I said, I figured about $1,-000.00 an acre on the land. Now the buildings were most peculiar buildings; you might almost call them special purpose buildings; and most people would have little or no use for them. * * * Based upon the information available to me at the time we took this listing, I would say that the fair market value of that property was a hundred and twenty-five to a hundred and fifty thousand dollars."

All of the individual defendants testified and each denied that there was any agreement between them which had anything to do with any one of them acquiring title to Leisure Lea. Defendants Federer, Liebmann and Sander each denied that Federer made any statement to Sander at the auction relating to the amount the latter should bid. Father Crane testified that he was interested in Leisure Lea but had no authority to make an offer and did not do so. In regard to his telephone conversation with Mr. Federer he testified that he told him he was interested in the place but would have to get authority from "the Provincial and that he in turn would have to get permission from the General" before an offer could be made; that he did not request that the foreclosure sale be postponed.

It would serve no purpose to recite the bulk of the evidence offered by defendants and it will not be included herein. Additional evidence will be hereinafter stated in the course of the opinion.

■ "In considering whether plaintiff made a submissible case we, of course, must view the evidence in the light most favorable to plaintiff and disregard all of defendant's evidence except such portions as may aid plaintiff." Reece v. Reed, Mo. Sup., 326 S.W.2d 67, 70.

■ We are of the opinion that there was not sufficient substantial evidence to support the first submission in Instruction No. 1. That submission was distinctly separate from the second submission and directed a verdict against defendants Federer, Liebmann, and Federer Realty Company upon a finding that during the period the exclusive listing contract was effective (2-15-56 to 10-31-56) said defendants made no bona fide efforts to find a purchaser as set out in said contract, discouraged potential buyers, and that if bona fide efforts had been made the property could have been sold in time to have prevented foreclosure at a sales price above the indebtedness of plaintiffs on said property. The encumbrances at that time were approximately $80,500 principal, plus current interest. In the sales contract plaintiffs agreed to sell the premises for $150,000 or, alternately, the unimproved 90 acres for $90,000 and the improved 10 acres for $89,-500, or for "such other price and terms to which we shall consent."

■ The Realty Company did not guarantee that it would sell this property. It was, however, required to exercise reasonable skill and ordinary diligence in attempting to find a purchaser for it. Myers v. Adler, 188 Mo.App. 607, 176 S.W. 538. We do not think the evidence favorable to plaintiffs would support a finding that these defendants failed to make a bona fide effort to find a purchaser. Plaintiffs' evidence shows that said defendants (1) placed a "for sale" sign on the land visible from Baxter Road, (2) "advertised the property extensively every Sunday and ran ads that were larger than usual on that type of property", (3) Mr. Federer answered numerous inquiries about the property from various people and tried to sell it to them, and (4) Mr. Liebmann took three prospects out to look at the property.

The fact that the realty company failed to sell the property would not indicate that it did not make a bona fide effort to do so. Plaintiffs tried in various ways and used numerous agents over a period of over three years and did not sell it. It was admittedly a difficult property to sell, as indicated by the testimony of Mrs. Fitzpatrick who stated that "if anyone knows anything

at all about real estate they know a piece of property like that does not sell overnight, it takes time, sometimes even years, to dispose of a piece of property of that size."

 Plaintiffs contend that the fact that these defendants quoted the price of the property as a whole at various amounts exceeding $150,000 would support a finding that they were attempting to discourage potential buyers. We do not think so. It is common knowledge that the asking price for real estate is often more than the amount for which it can be bought. Federer Realty was authorized to sell the property for $150,000. If it expected to obtain that amount it was not an indication of bad faith that it priced the property at $179,500 or even $200,000.

The proof is also deficient in other respects. One element of this submission permitted a finding that if bona fide efforts had been made the property could have been sold at a price above the indebtedness of plaintiffs on the property. There is no evidence that, during the period of this contract, plaintiffs would have consented to sell the property for less than $150,000 and certainly there is no evidence that they would have accepted any offer (less than $150,000) that exceeded the indebtedness, i. e., $80,500. In this connection we note the testimony of Mrs. Fitzpatrick to the effect that as late as March 8, 1957, she had turned down an offer of $125,000 for the property.

 We are also of the opinion that, as a matter of law, the failure of these defendants to effect a sale of Leisure Lea prior to October 31, 1956, would not have been the direct proximate cause of any damage plaintiffs sustained by reason of their failure to sell the property before foreclosure. This for the reason that more than five months elapsed between the time the exclusive sales contract expired and the date of foreclosure. During that period plaintiffs endeavored to sell the property themselves, listed it with other real estate brokers, and held the highly advertised auction in an effort to effect a sale at a price satisfactory to them. Since, by every means at their command, plaintiffs were unable (or refused) to sell the property at a price exceeding the encumbrances during the last five months before the foreclosure sale, it cannot reasonably be said that the failure of the named defendants to effect a sale of it during a prior period was the proximate cause of the damage resulting from a failure to sell before foreclosure. We recognize that no hypothesis referring to proximate cause was contained in the submission we are considering but we think such was an essential element of the submission and hence should properly be considered in determining whether plaintiffs made a submissible case upon the theory hypothesized.

 It is also our conclusion that plaintiffs failed to make a submissible case on the second submission in the instruction. It directed a verdict upon a finding, in part, "that on or about the 9th day of March, 1957, * * * any two or more of the defendants * * * entered into an agreement and understanding with each other not to bid against each other and carried out the said agreement and understanding at such auction sale, and that by reason thereof chilled the bidding, * * * and if you further find that anyone, as a direct and proximate result of said alleged conspiracy * * * failed to make bona fide bids at the foreclosure sale mentioned in the evidence * * *." Plaintiffs had the burden of proving the agreement or conspiracy submitted by clear and convincing evidence. Woolsley v. Wells, Mo.Sup., 281 S.W. 695. In the case of Walsh v. Walsh, 285 Mo. 181, 226 S.W. 236, 242, this court stated that "Fraud is never presumed; and, while it may be proved by circumstantial evidence, if the transaction relied upon to prove fraud is as consistent with honesty and good faith as with a fraudulent purpose, it will be referred to the better motive." 226 S.W. 242.

There is certainly no direct evidence of any agreement between the defendants.

There is also no direct evidence that any person refrained from bidding at either the auction or the foreclosure sale because of any act or conduct on the part of any of the defendants. Our review of the evidence favorable to plaintiffs fails to disclose any circumstances which would constitute substantial evidence of the agreement submitted.

One circumstance relied upon by plaintiffs is the loudly whispered suggestion of Federer to Sander at the auction to "bid $100,000 and stand pat for awhile." This is said to have occurred after Sander had bid $86,000. We are unable to understand how that would chill the bidding at the auction. Sander did not bid $100,000. The fact that the suggestion to do so was made to him should not reasonably have discouraged anyone wanting to bid in the area between $86,000 and $100,000. As is true at any auction, they needed only to bid in order to find out the future course Sander would follow. Also, we think the suggestion could not reasonably be said to indicate an agreement between any of the defendants not to bid against each other at the auction. Federer was encouraging Sander to raise his own bid $14,000. If Sander had followed the suggestion it would have been very helpful to plaintiffs and would likely have resulted in the sale of the property at a price which would have permitted plaintiffs to receive about $15,000 for their equity.

Plaintiffs also contend that it is significant that after the auction Sander told Mr. Fitzpatrick he had no further interest in the property and yet he came to the foreclosure sale prepared to comply with the trustee's requirements concerning the manner of payment. We do not think those facts would tend to prove an agreement. There is no reason why Sander could not have changed his mind and thereafter have contacted the trustee and ascertained the requirements concerning payment in the event he was successful in buying the property at the foreclosure sale.

Another circumstance relied upon by plaintiffs is the conduct of Bouckaert in making the $24,000 loan in complete reliance upon the recommendation of Mr. Federer and the fact that the latter was his agent in collecting interest and in handling the details concerning the foreclosure. That was the normal conduct for a real estate agent and client who had been doing that type of business together for 40 years. It was natural for Federer to endeavor to keep his client from sustaining a loss on a loan he had recommended. On the other hand, Bouckaert merely took the steps required to protect his interest, i. e., (1) foreclosure after default, and (2) bidding substantially the amount required to cover his loan at the foreclosure sale. We see nothing in that conduct to support plaintiffs' case.

Plaintiffs also rely on their testimony to the effect that shortly after the foreclosure sale Mr. Sander told them that if Father Crane bought the place he would give one third of the profit to them and one third to Mr. Federer. That statement is difficult to understand. It does not appear that Sander was under any legal obligation to either the plaintiffs or Federer. However, Father Crane had been definitely interested in purchasing the property at the time of the sale. Plaintiffs had been in contact with him and Mr. Federer talked with him in the morning the day of the sale. Plaintiffs had pleaded with Mr. Federer, as agent for Bouckaert, to postpone the sale so that time would be available to consummate a sale to Father Crane. Under these circumstances Sander apparently felt that he was under a moral obligation to share the profits with plaintiffs and Federer if the property was sold to Father Crane. While we find it somewhat difficult to understand Sander's generous attitude, we do not think this circumstance is substantial evidence of an agreement between the defendants, or any two or more of them, not to bid against each other at either of the sales. Actually, Sander did bid against Bouckaert at the foreclosure sale.

Another circumstance relied upon by plaintiffs is the alleged fact that the trustee, Liebmann, did not wait long enough after Sander bid $25,050 before he "knocked" the property off to him. The testimony is that after Sander bid Liebmann waited "a little while" and then asked three times if there was another bid, and, when none was made, waited "maybe a half minute" and declared that Sander was the purchaser. We see no merit in this contention. It appears that everyone present was afforded ample time to make a bid if he desired to do so.

We will not further extend this already lengthy opinion by a more detailed discussion of the facts and circumstances in evidence. We deem it sufficient to say that we have carefully considered all of the evidence favorable to plaintiffs and do not find any substantial evidence which constitutes convincing proof of the second submission in Instruction No. 1.

Since we have ruled that plaintiffs failed to make a submissible case we expressly refrain from ruling as to whether the facts hypothesized in either of the submissions in the instruction would have been sufficient to support a verdict for plaintiffs even if they had been supported by the evidence.

The conclusion we have reached makes it unnecessary to discuss other points briefed.

The order entering judgment for defendant Bouckaert is affirmed. The orders granting new trials to the remaining defendants are reversed and the cause is remanded with directions to enter judgment for said defendants in accordance with their motions for directed verdicts.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.